**Donna REILLY, Peter Reilly and Heather Reilly, p.p.a. Donna Reilly and Peter Reilly**

v.

**UNITED STATES of America.**

**Civ. A. No. 85-0748 P.**

United States District Court, D. Rhode Island.

July 28, 1987.

978

Mark S. Mandell, Providence, R.I., for plaintiffs.

Everett C. Sammartino, Asst. U.S. Atty., Dist. of R.I., Providence, R.I., for defendant.

## OPINION AND ORDER

PETTINE, Senior District Judge.

This is a medical malpractice action under the Federal Tort Claims Act ("FTCA") brought by the plaintiffs, Donna and Peter Reilly, on behalf of themselves and their baby daughter, Heather. They allege that the defendant, acting by and through its attending obstetrician, failed to exercise a proper degree of care in the treatment of Donna Reilly during her labor and delivery

of baby Heather, and that as a consequence Heather was born with a devastated brain.

Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 2675 of the FTCA, 28 U.S.C. § 1346(b) and 28 U.S.C. § 1331.

## I. FACTS

Heather is a helpless individual, "significantly delayed developmentally" and unable to see; she will never be able to walk, talk, feed or take care of herself in any way.

The events giving rise to this tragedy commenced on December 11, 1984. At the time, Peter Reilly was on duty with the United States Navy stationed in Newport, Rhode Island; his 22 year old expectant wife, Donna, was in active labor. At 3:35 p.m., she was admitted to the Newport Naval Hospital and placed in the charge of Lieutenant Commander Robert Farber, an obstetrician.

A clear understanding of the negligence issue requires a detailing of both the progression of the events leading up to the actual birth and the expert medical testimony interpreting these events.

The first dramatic incident occurred at 9:00 p.m. when a deep deceleration in fetal heart rate, which did not respond to therapy, was evidenced on the fetal monitor. The record shows that at the time the fetal heart rate began to decelerate, the mother had been in labor for more than six hours, the birth was progressing very slowly, the mother's cervix was not fully dilated and she had a reasonably large baby in the occiput posterior position (head facing up rather than down). All these signs screamed that the baby was being asphyxiated and that a caesarean section should have been performed without delay. Dr. Farber pressed for a vaginal birth instead of performing a caesarean section, which the plaintiffs' specialist Dr. Barry Schifrin testified was mandated. Transcript ("Tr.") of 11-18-86 at 53, 99-100 (Schifrin). It should be noted that Dr. Farber himself recognized this as shown by his own actions. He did, indeed, call and mobilize the operating room crew at approximately 9:00

p.m. with the specific intention of performing just such an operation but then abandoned the idea.

The seriousness of this omission was described by Dr. Schifrin:

[Dr. Farber] simply has no basis for optimism, just obstetrically, quite apart from the condition of the baby. He has no obstetrical reason to consider delivery imminent or if he is going to do it mechanically that it is going to be safe. He had no basis to assume that I can deliver this baby from below [vaginally] safely and quickly.

Tr. of 11-18-86 at 103 (Schifrin).

In addition to the foregoing negligent conduct, it was also established that Dr. Farber negligently tried to have Mrs. Reilly push before her cervix was fully dilated, Tr. of 11-18-86 at 106, 113 (Schifrin); Tr. of 11-19-86 at 31 (Mrs. Reilly). In short, he prolonged Mrs. Reilly's labor in spite of the crisis at hand. Dr. Schifrin testified that "right under their eyes, that pattern ... progressively deteriorate[s] and deteriorate[s]," *id.* at 108; it "bespeaks for an [un]equivocal episode of progressive, relentless asphyxiation of the baby right under their eyes." *Id.*

Exacerbating the situation, at about 10:15 p.m., Dr. Farber moved Mrs. Reilly to the operating room, after he had "inexplicably, beyond anything reasonable and logical," removed the electronic monitor, *id.* at 114.

I cannot possibly understand the sense of that no matter how fair I try to be ... in my own heart of hearts, there is no possible explanation that would justify that.

*Id.* at 116.

Dr. Schifrin explained that the removal of the monitor at that point was "absolutely" a deviation from the required standard of care

[b]ecause they have had several episodes of fetal distress. They have ongoing deceleration. They have a deterioration of the pattern....

\*　　\*　　\*　　\*　　\*　　\*

and it is inconceivable that they would not bring the monitor with them under these circumstances.

\* \* \* \* \* \*

It's going to tell them that other episodes of decelerations are occurring, the heart rate pattern is deteriorating with the rising baseline....

*Id.* at 124–25.

The need for the monitor in the delivery room was crucial. Had they not removed the monitor, they would have seen further dramatic deterioration and even then could have made a last, frantic effort to perform a caesarean that might have saved the baby. As Dr. Schifrin stated:

Reasonably it is yet recoverable and if it's not recoverable, if it is certainly not completely recoverable, it is almost certainly going to be a better outcome than what was eventuated in this case. This is a time related phenomen[on] in relationship to the asphyxia and it's an event-related phenomen[on] in relationship for the actual delivery itself.

*Id.* at 128.

In the operating room, Mrs. Reilly still did not respond; Dr. Farber, in his persistence for a vaginal birth, compounded his negligence by applying a vacuum and suction instrument to the baby's head. Though such a procedures may be medically acceptable in certain circumstances, here it was not because there was progressive asphyxiation "on a chronic, on a long term basis." As Dr. Schifrin explained:

On top of that, I must in all fairness add, the additional potential trauma ... of the delivery itself ... [, which] could explain a great part of this.... [W]e have an asphyxia episode, which in and of itself can explain all of the injury.... On top of this we have what seems unequivocal evidence of trauma during delivery. You need no evidence of trauma to explain what happened here. But having explained what happened here on the basis of asphyxia, you then say was there potential, was there trauma visited on the

baby on top of that and the answer is yes, unequivocally.

*Id.* at 132.

Dr. Schifrin's testimony was buttressed by another expert, Dr. Ashby Coopland, a Board Certified obstetrician, practicing at Bay State Medical Center. Dr. Coopland added that there was a further deviation from the required standard of care in that the defendant did not obtain an accurate tracing of Mrs. Reilly's uterine contractions. Dr. Coopland explained that the monitor was not accurately recording the contractions, which the defendant should have known were there. And yet he did nothing to correct this particularly bad situation, which was preventing him from receiving vital information. A remedy was readily available; Dr. Coopland said:

There are several things that we would try to do. We would adjust the [external] tocodynamometer.... If that didn't work, we would get ... another one. If the external would not work at all, then I think we would be—we would be forced to use an internal—internal pressure catheter.

Tr. of 11–24–86 at 24 (Coopland).

Capping the profusion of evidence establishing negligence, there is the attending doctor's own admission in a deposition taken on September 9, 1986 that a caesarean should have been performed at 9:15 p.m.:

Q. On December 11, 1984 would the standard of care of treating a patient such as Donna Reilly at 9:15 p.m. require delivery by caesarean section?

A. ... yes, it should have been done.

Plaintiffs' exhibit 22 at 54.

Though the defendant in no way disputes the foregoing—it did not offer a scintilla of evidence to debate liability or the nature and extent of the injuries suffered by the plaintiffs—it does make a feckless attack in its post-trial brief. For example, at page 46 of said brief, Dr. Schifrin is said to have testified that approximately

70% of the time healthy babies are born, although the fetal heart monitor was indicating ominous fetal stress. (Trans. 11/18, Pg. 156–157, 158; 159.) That [Dr.

Schifrin] has seen heart rate patterns such as Heather's, and yet the baby was born normal and healthy (Trans. 11/18 162–163.) ... there are simply no guarantees in medicine even if you do everything right (Trans. 11/18—165).

Dr. Schifrin later deleted the word "ominous" and substituted the word "abnormal."

This argument is completely misplaced; Dr. Schifrin's testimony is cited entirely out of context. Viewed in the context of Dr. Schifrin's explanation, which the defendant omitted, the 70% statistic has no application to this case:

I believe the statistics that you're using are my own. That is the prediction of the heart rate pattern using no clinical information whatsoever ... it [those statistics] does not include the certain knowledge that the baby is asphyxiated. On the basis of the certain knowledge that the baby is asphyxiated, as in this case, I can say with considerable degree of medical probability, far, far in excess of fifty percent that what happened here is directly related to that outcome. And that the statistics which you are quoting represent ... a blind estimation of outcome—blind estimation of outcome based on no clinical information whatsoever, only based on the clinical interpretation of the heart rate pattern from which all other information has been removed. That is in this one sense, not real medicine, not the real world, and in this situation in which there is no question of the baby's asphyxia, on the basis of totally objective information, there can be no doubt about ... when this event [brain damage] happened.

Tr. of 11–18–86 at 159–160 (emphasis added).

There is nothing, simply nothing, in this record from which one can say that there was a 70% probability Heather would have been born healthy—there was no real expectation of a safe vaginal delivery at any time. In its narrow approach, the defendant's thinking is focused solely on an abnormal heart rate and thus neglects the factual context of the plaintiffs' case.

Later, at page 46 of its post-trial brief, the government states: "Dr. Schifrin's testimony indicated that the Navy obstetrician was practicing within the standard of the community and that Dr. Schifrin's level of expertise should not be imposed on this obstetrician." This was with reference to reading and interpreting the fetal heart monitor indicators. I assume the innuendo of this argument is that it was beyond the standard of care to expect an obstetrician to interpret the monitor charts, as Dr. Schifrin did, and thus know a crisis was at hand.

This contention has no basis in the record; indeed, it is belied by the record. As the plaintiffs state in their reply brief at page 85: "Dr. Schifrin very carefully pointed out that he would never hold Dr. Farber to his (Dr. Schifrin's) standard of interpretation, but was just holding him to the standard of a good, solid reliable obstetrician. [Tr. of 11/18/86, at 109 (Schifrin).]" As Dr. Schifrin stated:

And let me just emphasize that that is a minimum ... a minimal standard of care ... this is a basic fundamental minimal standard of care....

Tr. of 11–18–86 at 116 (emphasis added).

The incredibility of the government making this frivolous argument is further manifested in the record as noted in the margin.[1]

In conclusion, the defendant tries to create in its brief what does not appear in the

---

1. Transcript of 11–18–86 at 108–111 (Schifrin):
 THE COURT: Doctor, not meaning to give kudos in trying to solicit an answer but you're an expert in the sense that you're a professor, you're a teacher, you're an author. Let us talk about an obstetrician who is just a good solid doctor. Should he have been able to read into these charts what you read into them?
 THE WITNESS: Well, the answer is that's not fair.

 THE COURT: What, I'm not being fair—
 THE WITNESS: No, it's not fair for me to insist that he read into these charts what I read into the charts. That's not fair.
 THE COURT: But you'd have to be able to read the charts in order to—
 THE WITNESS: Let us—if I can answer the question indirectly indirectly [sic], one, I would never hold him to my standard of interpretation. That's simply not fair.
 THE COURT: No, I don't think it is.

record: that Dr. Farber merely made an error of judgment that does not violate the standard of care for the average practitioner. No such evidence was offered or solicited at trial; there is not even a suggestion that Dr. Farber made an error of judgment. This argument is a pure figment and a rather reckless statement.

The overwhelming evidence and unequivocal testimony of all the plaintiffs' experts is that "the standard of care for the average practicing obstetrician treating and caring for Donna and Heather Reilly on that day [December 11, 1984] required prompt delivery." Tr. of 11–18–86 at 52 (Schifrin); Tr. of 11–24–86 at 22 (Coopland). Dr. Coopland agreed that a caesarean section should have been performed at around 9:15 p.m., Tr. of 11–24–86 at 29, and added yet another omission: Dr. Farber further deviated from the standard of care by failing to obtain fetal scalp blood samples. *Id.* at 25.

## II. APPLICABLE LAW AND FINDINGS: NEGLIGENCE

■ Under the Federal Tort Claims Act, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, on claims against the government for personal injuries "caused by the negligent or wrongful act . . . [of its employees] while acting within the scope of [their] . . . employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The federal district courts have exclusive jurisdiction to hear these actions. 28 U.S.C. § 1346(b). The tortious conduct in this case took place in Rhode Island; thus the applicable law is that of Rhode Island.

In this state, the standard of care imposed upon a doctor is enunciated in *Wilkinson v. Vesey*, 110 R.I. 606, 613, 295 A.2d 676, 682 (1972), where the court stated:

The physician's standard of care has been defined as the employment of the same degree of diligence and skill which is commonly possessed by other mem-

THE WITNESS: That standard—
THE COURT: So that's why I'm asking you the question—
THE WITNESS: If I could just simply hold him—
THE COURT: Is this within the scope of the general knowledge of a—just a good solid reliable obstetrician?
THE WITNESS: Absolutely. Number one. Number two, it's—they've already recognized that. It's not me asking them to recognize this is the stress. It is me asking them to operate on the pieces of information that are available immediately and, obviously, available to them. And one can gain support from this even my position, from the statements of Dr. Farber in his deposition, who, in fact, agrees. He agrees that a caesarean section should have—

\* \* \* \* \* \*

THE WITNESS: If the doctor—doesn't formulate part of my original opinion, okay, but it coincides totally with my own opinion that in his own words a caesarean section was necessary. The realities, I believe his statement in his own deposition, there has been an obvious and traumatic change in the heart ·rate. There is no question, I believe, but that the people there, including Dr. Farber, have responded to it. He and only he mobilizes the crew.

Q. What crew, the operating—
A. The operating crew. He believes there is—
THE COURT: Are you saying—I want to be sure I understand this. Are you saying even if we take, as point of argument, that Dr. Farber and his crew do not and did not possess the knowledge that you have. And even if we do not want to attribute to them the ability to interpret these charts as you do, the fact remains they did indeed interpret them as you have because they did indeed as is shown by the charts mobilize a crew to be prepared to perform a caesarean?
THE WITNESS: Yes.
THE COURT: In other words, they manifested in their conduct an interpretation which is consistent with yours?
THE WITNESS: Absolutely.
THE COURT: And yet did not perform the caesarean?
THE WITNESS: Absolutely.
THE COURT: That's rather unusual, isn't it?
THE WITNESS: It is very unusual given the circumstances and the fact that they have the crew there and all of the material that has been presented here.

\* \* \* \* \* \*

bers of the profession who are engaged in the same type of practice in similar localities having due regard for the state of scientific knowledge at the time of treatment.

Both Dr. Schifrin and Dr. Coopland testified that the deviations from the standard in this case were unacceptable for any obstetrician wherever such person might be practicing. *See* tr. of 11–18–86 at 115–16 (Schifrin); tr. of 11–24–86 at 22–23 (Coopland).

"Localities" as used by the state Supreme Court does not have a parochial meaning; it has been liberalized and so it follows that the standard in Rhode Island is no less than that existing in Boston, Massachusetts or New York City. *Schenck v. Roger Williams General Hospital*, 119 R.I. 510, 521, 382 A.2d 514, 520 (1977); *Wilkinson v. Vesey*, 110 R.I. at 613, 295 A.2d at 682.

Based on the foregoing facts and the applicable law, I find the defendant negligent and consequently required to respond in damages.

## III. DAMAGES

The plaintiffs seek economic damages for Heather's future care and loss of earning capacity. They also seek non-economic damages for the following: the loss of Heather's enjoyment of the quality of life, conscious past and future pain and suffering; Mr. and Mrs. Reilly's past and present emotional distress resulting from witnessing Heather's traumatic birth and from caring for Heather; Mr. and Mrs. Reilly's loss of their daughter's love, society and affection; and Mr. and Mrs. Reilly's loss of each other's love, society and affection.

Heather's future care is divided into two phases: at home from 1986–2025, and residential care from 2026–2064. This will be explained in part III, B, 2, *infra*.

For care at home, the plaintiffs seek recovery for the following seventeen items:

| | |
|---|---|
| Ranch-Style Home | $ 169,545 |
| Architectural Modifications, including Fees | 68,433 |
| Special Room Equipment | 16,716 |
| Treatment Equipment | $ 21,416 |
| Medications, Lab Tests and Special Products | 105,837 |
| Electric Wheelchair | 27,983 |
| Electric Wheelchair Maintenance | 15,093 |
| Modified Van | 115,659 |
| Van Operating Costs | 68,501 |
| Medical Support Services | 144,216 |
| Support Services: Heather | 1,054,286 |
| Support Services: Parents | 59,762 |
| L.P.N. Care | 5,753,853 |
| Babysitting | 179,426 |
| Respite Care | 92,859 |
| Rehabilitation Engineer & Equipment | 83,614 |
| Special Education Teacher | 361,864 |
| Total: | $8,338,513 |

For residential care, the itemization of damages the plaintiffs seek are as follows:

| | |
|---|---|
| Medications, Lab Tests & Special Products | $ 24,722 |
| Electric Wheelchair | 12,419 |
| Electric Wheelchair Maintenance | 9,354 |
| Modified Van | 21,274 |
| Van Operating Costs | 19,363 |
| Medical Support Services | 118,145 |
| Support Services: Heather | 1,888,855 |
| Support Services: Parents | 24,085 |
| Home Visit Care | 388,105 |
| Rehabilitation Engineer & Equipment | 43,664 |
| Special Education Teacher | 354,849 |
| Full-Time Case Manager, 2042–2064 | 89,400 |
| Legal Guardian | 4,194 |
| Residential Care | 1,180,016 |
| Total: | $4,178,434 |

The plaintiffs also seek compensation for the value of Donna Reilly's services as a "case manager" between the years 1986 and 2042, in the amount of:

| | |
|---|---|
| | $1,095,695 |
| Grand Total: | $13,612,642 |

As accurately summarized by plaintiffs' counsel, the testimony proved, and the government does not dispute, that Heather suffered from hypoxic-ischemic encephalopathy which has left her "significantly delayed developmentally" and unable to see. As already stated, she will never be able to walk, talk, feed herself, or take care of herself in any way. Compounding this

complex problem is the future physical development of the child. She will develop sexually and physically which, of course, will add immeasurably to the problems attendant on her care and treatment.

Though Heather's condition is permanent, she will be able to be trained so as to recognize and become more intact and responsive to her environment.

Proximate cause is not at issue here; it is as well established as is the negligence of the defendant. It follows, therefore, that the plaintiffs are entitled to all damages that are the natural and probable consequence of the negligent conduct. This is "black letter" law as enunciated by our Rhode Island courts. *Main Realty Co. v. Blackstone Valley Gas & Electric Co.,* 59 R.I. 29, 50, 193 A. 879 (1937); *see also Atlantic Tubing & Rubber Co. v. Int'l Engraving Co.,* 528 F.2d 1272, 1277 (1st Cir.), *cert. denied,* 429 U.S. 817, 97 S.Ct. 60, 50 L.Ed.2d 77 (1976). And I quite agree with the defense that such damages are recoverable so long as they are based on "legally competent evidence instead of conjecture, speculation or mere possibility." *Pescatore v. McIntosh,* 113 R.I. 139, 149, 319 A.2d 21, 27 (1974).

Each item of damages the plaintiffs seek will be discussed separately as to both the facts and the law.

A. Non-economic Losses

1. *Heather's Past and Future Pain and Suffering*

■ In a previous confrontation with this tough task, I stated:

I will now consider pain and suffering. The full measure of a tribunal's sound discretion must be employed in assessing a fair amount as damages for the pain and suffering endured and/or to be experienced in the future by the injured party. The amorphous nature of the subject and the infinite variables that come into play make it impossible for the courts to fashion any precise rule. However, the strictures of reasonableness, good sense, nature of the injuries, length of the suffering and the eschewal of sentimentality

are guides which assist in determining a fair award. Each case must be viewed in the perspective cast by its unique facts and should not be controlled by judgments rendered in other cases—identical facts in different cases can never exist. No two individuals are alike and no two injuries to separate individuals are ever counterparts of each other. *Griffin v. United States,* 500 F.2d 1059 (3rd Cir. 1974); *Frankel v. Heym,* 466 F.2d 1226 (3rd Cir.1972); *Wry v. Dial,* 18 Ariz.App. 503, 503 P.2d 979 (1973); 22 Am.Jur.2d *Damages,* Sec. 368, 476.

*Caron v. United States,* 410 F.Supp. 378, 395 (D.R.I.), *aff'd,* 548 F.2d 366 (1st Cir. 1976).

The plaintiff, Heather Reilly, seeks an award of more than two million dollars for the pain and suffering she has endured and will continue to suffer for the rest of her life. The government does not deny the enormity of the injuries and suffering, past and future, which she has endured and will continue to endure.

Here the uncontradicted evidence shows Heather's condition as follows: she is permanently and profoundly brain damaged; she feels pain and discomfort, especially during essential physical therapy; she used to cry and scream when touched; she now suffers and cries from colic, gas, muscle contractions and the need to be repositioned; she vomits and when she does so, she is unable to move out of the way—as a consequence, if not immediately caught, she lies in it until attended to; and she needs nasal suctioning and regular chest therapy to relieve build-up of phlegm in her lungs. All this is caused by her brain damage. This condition has been going on for the past two years, and I have heard no evidence to indicate that these difficulties will abate in the future. To the contrary, the evidence is that the condition will remain.

Rhode Island law allows recovery for past and future pain and suffering in personal injury actions. *See Hayhurst v. LaFlamme,* 441 A.2d 544, 545 (R.I.1982). The defendant does not argue that there is no entitlement here for Heather's past and

future pain and suffering. Rather, the defendant correctly asserts that only compensatory damages can be awarded under the FTCA, and that excessive damages, though characterized as compensatory, are actually punitive and not allowable. It cites *Felder v. United States*, 543 F.2d 657, 669 (9th Cir.1976) in support of this position.

As I stated in *Caron, supra*, at 396:
I must exercise my discretion and make an award that comports with fairness. In all candor such an exercise is nothing more than the administration of personalized justice. How can it be otherwise when the end product of existing decisional law confesses that the computation of an award for pain and suffering cannot be impersonalized through the formulation of any inflexible rule? As a consequence, what I do here, in the exercise of what I deem to be "sound discretion," has to be a manifestation of my own economic predilections in repairing a harm caused by another's wrong. However else it may be termed, it is nothing more—it is nothing less.

In *Caron, supra*, ten years ago, I awarded $500,000 in the face of a $1,500,000 request. A court should seek to maintain some degree of uniformity in its approach to similar problems. But it must not lose sight of the differences each case presents when compared to others—if comparisons can be made with logic and intelligence. I will not attempt a comparison of the physical condition of the Caron and Reilly babies; it suffices to say both are tragically destroyed. However, it is clear, in today's setting, the crass assessment of money must recognize its present value.

Being as "dispassionate" as "my abilities allow" and "keenly sensitive to the responsibility which is mine," I find that one million ($1,000,000) dollars is a fair award "for a lifetime of pain and suffering to be endured by this crippled mind."

2. *Psychic Injury to Mr. and Mrs. Reilly*

■ Psychic injury to a parent caused by observing the physical injury of her child was first determined to be compensable under Rhode Island law by this Court in *D'Ambra v. United States*, 354 F.Supp. 810 (D.R.I.), *aff'd in part and vacated in part*, 481 F.2d 14 (1st Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973), *aff'd*, 518 F.2d 275 (1st Cir.1975). A finding of liability resulted in an appeal to the First Circuit Court of Appeals, which court certified the following question to the Rhode Island Supreme Court:

May a non-negligent plaintiff mother, who is foreseeably in the vicinity of her minor child but not in the child's zone of danger, recover damages for mental and emotional harm, accompanied by physical symptoms, caused by observing the death of her child resulting exclusively from the negligence of defendant in driving the truck which struck the child, although she suffered no physical impact?

The State Supreme Court in *D'Ambra v. United States*, 114 R.I. 643, 338 A.2d 524 (1975) gave an affirmative answer to that inquiry, announcing at the same time certain criteria to be satisfied: "physical proximity, the actual witnessing of the accident, and the personal relationship existing between the bystander-plaintiff and the victim." 114 R.I. at 656, 338 A.2d at 531. It follows that within the framework of the question, psychic injury is recoverable if "accompanied by physical symptoms." Therein lies the difficulty of this controversy, because Mrs. Reilly does not appear to have suffered any physical symptoms, and the Rhode Island Supreme Court neither was asked in *D'Ambra* nor has subsequently decided whether bystanders may recover emotional distress damages when they have suffered no accompanying physical symptoms.

If I were of the same mind, there would be no way I could improve on the extensive and scholarly analysis of this criterion for recovery as expounded by Judge Selya in *Plummer v. Abbott Laboratories*, 568 F.Supp. 920, 925–27 (D.R.I.1983). He concluded his examination of this issue by saying:

There is no valid reason to believe that the state supreme court, especially given its prior pronouncements in related matters, would not once again align itself

with the overwhelming weight of authority across the nation.... [T]he wave of modern jurisprudence still crests upon the tenet that psychic trauma is not actionable where, as here, both impact and physical manifestations of the asserted emotional harm are absent.

*Id.* at 926–27.

However, I am more impressed by the treatise in *Culbert v. Sampson's Supermarkets, Inc.*, 444 A.2d 433 (Me.1982), which jettisoned the symptomatology requirement in bystander emotional distress actions. Accepting there is an overwhelming weight of authority, as asserted in *Plummer,* I cannot conclude that it should be followed when juxtaposed with such sound and learned reasoning to the contrary. If I were to choose, I would travel the road laid out by *Culbert.* I find Justice Violette's arguments most persuasive; after reviewing the debate in this area, in writing for the court, he concluded:

Several courts appear to further restrict liability to instances where the mental distress is evidenced by physical symptoms or injuries. *See, e.g., Dziokonski v. Babineau,* 375 Mass. 555, 380 N.E.2d 1295 (1978); *Corso v. Merrill,* 119 N.H. 647, 406 A.2d 300 (1979). In *Wallace v. Coca-Cola Bottling Plants, Inc.,* Me., 269 A.2d 117 (1970), this Court required proof of "objective symptomatology" (in that case, nausea) before the plaintiff could recover for mental distress. We now reject the notion that the plaintiff must allege or prove physical injuries or physical manifestations of the distress, as required by *Wallace, supra,* as well as emotional and mental trauma, in order to prevail. We do so for three reasons. First, the requirement in its application is overinclusive since it permits recovery for demonstrably trivial mental distress claims accompanied by physical symptoms. Second, it is underinclusive since serious distress is arbitrarily deemed not compensable if not accompanied by physical symptoms. Third, such a rule "encourages extravagant pleading and distorted testimony." *Molien v. Kaiser Foundation,* 27 Cal.3d 916, 929, 167 Cal.Rptr. 831, 838, 616 P.2d

813, 820 (1980). Given the state of modern medical science, we can safely conclude that proof of "objective symptomatology" is no longer necessary, although it may be highly persuasive evidence, to establish mental distress. *Sinn v. Burd,* 404 A.2d at 679.

*Id.* at 437.

In view of such reasoning, I find it very difficult to predict whether the Rhode Island courts would adopt the majority rule on this issue. I therefore believe this question should be certified to the Rhode Island Supreme Court. This inclination is strengthened because, in the first instance, the First Circuit Court of Appeals certified the psychic injury question in *D'Ambra, supra.* In addition, the quantum of damages being sought by the plaintiffs is most substantial.

Because a certification as to symptomatology should not be made unless all the established *D'Ambra* criteria have been satisfied, however, I will discuss the "physical proximity, the actual witnessing of the accident, and the personal relationship existing between the bystander-plaintiff[s] and the victim." 114 R.I. at 656, 338 A.2d at 531. It cannot be disputed that all exist in this case. Mr. and Mrs. Reilly were present throughout the delivery; they were aware of all the difficulties being encountered, which awareness culminated in seeing Heather's physical condition. Plaintiffs' counsel vividly describes this with reference to the transcript, in his post-trial brief at page 73:

Instead of Heather's birth being the end of this traumatic episode, both Mr. and Mrs. Reilly were keenly aware of the problems that were being encountered. When Mr. Reilly saw his daughter for the first time he was shocked and scared to immediately notice that she looked blue '[f]rom mid chest up [to] her head.' [Tr. of 11/14/86, at 82 (Mr. Reilly).] Mrs. Reilly instructed Peter to go over and check the baby's condition, knowing that there was a problem. (*Id.* at 82) They both noticed a strange silence from Heather, she had yet to cry. Through the crowd of doctors and medical staff

that were working on Heather, Mr. and Mrs. Reilly watched as Heather's limbs were lifted two or three times from the table and dropped like dead weight. They thought that their baby was dead. The doctor called for sodium biocarb and that just reinforced their fears. [Tr. of 11/19/86, at 35 (Mrs. Reilly); Tr. of 11/24/86, at 81–82 (Mr. Reilly).]

I cannot conceive of a situation having greater physical proximity, relationship, and witnessing of the incident.

With the three established *D'Ambra* criteria satisfied, this matter is ripe for certification. As I have already stated, there is no proof of "objective symptomatology" for Mrs. Reilly; and though Mr. Reilly's depression may be causally related to Heather's birth, their mental distress claims should be considered jointly. This item of damages will therefore not be considered at this time. The question will be certified to the State Supreme Court. The plaintiffs will draft the question and appropriate certification.

### 3. *Loss of Consortium*

■ Mr. and Mrs. Reilly have each requested $1,000,000 in damages for the loss of spousal consortium and $1,000,000 in damages for the loss of Heather's society and companionship. The defendant's objection to these claims is premised on the failure of the plaintiffs to make them administratively and the fact that they are being sought "via an amended complaint, which was filed on the day of trial" and so was prejudicial; furthermore, the defendant argues, they should not be allowed since "such claim[s] would have [their] foundation on plaintiffs' psychic injury claim which is not recognized under Rhode Island law, in the circumstances of this case." Defendant's post-trial reply memorandum at 5.

R.I.G.L. § 9-1-41 provides in pertinent part:

(a) A married person is entitled to recover damages for loss of consortium caused by tortious injury to his or her spouse.

(c) Parents are entitled to recover damages for the loss of their unemancipated minor child's society and companionship caused by tortious injury to said minor.

Rhode Island law thus clearly allows Mr. and Mrs. Reilly to recover for the loss of Heather's society and companionship. The tragedy being endured by Heather's parents is so acute that it would be a needless exercise to attempt to articulate the depth of their societal and companionship loss. They have been deprived of the enrichment of life a baby brings to parents. As evidenced in their testimony, Mr. and Mrs. Reilly will never experience the legion of joys a parent reaps in the progression of companionship with a daughter as a baby, child, teenager and adult.

However, it is unclear whether the facts of this case entitle Mr. and Mrs. Reilly to recover for the loss of each other's spousal consortium. The statutory remedy requires tortious injury to the spouse whose consortium has been lost. Here, the cognizability of such injury turns on whether Rhode Island law allows bystander emotional distress claims in the absence of physical symptomatology. Since I have decided to certify this question to the Rhode Island Supreme Court, I must defer ruling on the spousal consortium claims. Moreover, because I believe that this item and the claims for the loss of Heather's society and companionship should be considered together, I will not rule on any loss of consortium claims at this time.

### B. Economic Losses

### 1. *Loss of Earning Capacity (Heather)*

Loss of earning capacity is an entitlement under Rhode Island law. In *Markham v. Cross Transportation, Inc.*, 119 R.I. 213, 222, 376 A.2d 1359, 1364 (1977), wherein the plaintiff, because of injuries she received due to the negligence of the defendant, "was forced to give up her job" and was "only able to work part-time," the court approved recovery for loss of future earning capacity. And in *D'Andrea v. Sears, Roebuck & Co.*, 109 R.I. 479, 488–

89, 287 A.2d 629, 633 (1972), the court sustained the father's right to recover for the impairment or diminution of his minor child's earning capacity.

It is indisputable that Heather is permanently injured and will ever be totally deprived of earning power. Nevertheless, the defendant offers several arguments in support of its position that this item of damages should be disallowed. First, the defendant maintains that an award for lost earning capacity would be punitive and hence not allowable under the Federal Tort Claims Act. Second, the defendant disputes the plaintiffs' calculations of Heather's lost earning capacity, on three grounds: that inflation was erroneously considered; that the wrong tables were used to predict the lost work expectancy; and that the future earnings were incorrectly discounted to present value. I will discuss each of these objections separately, after which I will comprehensively review the parties' economic calculations.

a. Punitiveness

■ The defense maintains that since the plaintiffs seek an award for future medical and maintenance expenses for Heather, an award for lost earning capacity would be punitive. The rationale for this conclusion is the postulate that a medical and maintenance award would provide "all the necessary living expenses for Heather [and would also include an] award for institutionalization when her parents are no longer capable of caring for her." In support, the defendant cites *Flannery v. United States*, 718 F.2d 108, 112 (4th Cir. 1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984), and *Corrigan v. United States*, 609 F.Supp. 720, 733 (E.D.Va.1985), *rev'd on other grounds*, 815 F.2d 954 (4th Cir.1987).

In *Flannery*, the court felt compelled to reduce the award "for lost earnings because in part, it duplicates the award of future medical expenses." 718 F.2d at 112. The court reasoned:

An award of lost earnings is made to an incapacitated plaintiff so that he may provide for himself and his dependents those necessities, comforts and niceties he would have provided out of his earned income had he not been injured. In an FTCA wrongful death action, the survivors are entitled to an award based upon lost future earnings of the decedent only after a deduction of the decedent's estimated living expenses, for the survivors are entitled to no greater benefit than they would have enjoyed had the decedent lived and continued working. *Hartz v. United States*, 415 F.2d 259 (5th Cir. 1969). A successful plaintiff is entitled to be made as financially secure as he would have been had there been no injury or death, but no more.

In the usual case, a living plaintiff must pay his own living expenses, though an award for lost earnings may be the source of his funds. In this case, however, the plaintiff will be required to pay nothing, for the award of future medical expenses includes all of the personal expenses that the plaintiff will incur. Indeed, the testimony was that, in the future, he will need little skilled medical care. His personal expenses will be to provide himself with housing, food, and nursing and custodial care of the kind provided in a nursing home. That is the expense covered by the award for future medical expense. The label should not be permitted to mislead us, for, in truth, the judgment requires the United States to pay the plaintiff's personal living expenses twice. Thus, the award for lost earnings, as finally determined, should be reduced by the amount of the award for future medical expenses.

*Id.* at 112–13.

I cannot accept the majority opinion in *Flannery* as controlling decisional law to be applied in this case. To begin with, it was not a unanimous opinion. I agree with the dissent, which viewed the federal court as bound by a state law that entitled a personal injury plaintiff to damages both for lost earning capacity and for future medical expenses. The United States did not question the district court's award for lost earning capacity; rather, the *Flannery* court *sua sponte* raised this issue. Apart

from this, I believe the opinion is flawed in the scope of coverage it attaches to medical expenses; regardless of the factual analogies to *Flannery,* I cannot reason as that court did. The question is whether or not there will be duplicate payments. The answer is "no". The medical expenses do not cover the personal expenses the plaintiff would have incurred in earning her living, such as housing, food, and clothing. The *Flannery* court considered nursing and custodial care as part of these estimated personal expenses; with all due respect, I cannot accept this. Looking to Rhode Island law, I find that in analogous cases "personal expenses" are confined to those the claimant " 'would have to lay out as a producer to render the service or to acquire the money that he might be expected to produce'.... 'Personal expenses' ... includ[e] the expenses he would have to incur to generate his estimated future earnings or income." *Romano v. Duke,* 111 R.I. 459, 461–61, 304 A.2d 47, 49 (1973) (ascertaining damages receivable under Rhode Island wrongful death statute). To me, nursing and custodial care do not fall within the foregoing definition, which I feel is perfectly applicable to this case.

As the future care programs prepared by Drs. Minsky and Dr. Bussey indicate, *see* exhibits 37 and 38, Heather's future care needs, because of her condition, are a far cry from personal expenses incurred in earning a gross income. As these are two separate and distinct compensable losses, it can be said that an award for both does not result in a windfall. I reject the contrary view espoused by *Flannery,* just as the Ninth Circuit did in *Shaw v. United States,* 741 F.2d 1202, 1208 (9th Cir.1984). The plaintiffs rightfully point out that in *Shaw,* wherein an $11,732,345.43 award had been made by the trial judge, the Court of Appeals flatly rejected the *Flannery* holding that damages beyond future care costs are punitive under federal law, stating:

> [t]he Ninth Circuit has squarely rejected this analysis.... In *Felder, supra,* we recognized that such an expansive view of federal law would "impinge seriously upon the architecture of the [Federal Tort Claims] Act which provides for recovery according to the *lex loci delictus."*

741 F.2d at 1208 (citing *Felder v. United States,* 543 F.2d 657, 675 (9th Cir.1976)). Further, I point out that the *Shaw* court accepted the following definition of punitive damages:

> [D]amages are "punitive" only when "awarded separately for the sole purpose of punishing a tortfeasor who inflicted injuries 'maliciously or wantonly, and with circumstances of contumely or indignity.' "

741 F.2d at 1208 (*Kalavity v. United States,* 584 F.2d 809, 811 n. 1 (6th Cir. 1978)). I agree. I also agree that coercing the government into double compensation may be considered punitive, but that this simply is not the case here. I therefore find that Heather's loss of earning capacity is compensable. Furthermore, even if it may be said that the expenses to earn the projected lost earnings should be deducted, the defendant in keeping with its consistent conduct in the defense of this case offered no evidence in this regard.

**b. Inflation**

■ Should the Court make an award for lost wages, the defendant further argues it is improper because the economist considered inflation, which the defendant maintains is not allowed under Rhode Island law. Rhode Island law does not preclude consideration of the effects of inflation. In *Markham v. Cross Transportation, Inc.,* 119 R.I. 213, 222–23 and n. 5, 376 A.2d 1359, 1364 and n. 5 (1977), the court said:

> Although there is little authority in our jurisdiction to guide us in enumerating admissible factors in determining loss of future earning capacity, we do have the often-stated standard in negligence cases that " '[c]onsequences which are contingent, speculative, or merely possible, are not proper to be considered in ascertaining the damages.' " *MacGregor v. Rhode Island Co.,* 27 R.I. 85, 87, 60 A. 761, 762 (1905). We do not feel that predictions of wage growth due to economic conditions over a period of time

are so speculative as to be patently inadmissible. We see them as no more speculative than testimony as to prospects for future advancement. *See Miller v. Rhode Island Co.*, 82 A. 787 (R.I.1912), 22 Am.Jur.2d *Damages* § 315 (1965). Thus, if the trial justice considers the information material and relevant to the issue of damages in a particular case and based on competent evidence of economic conditions, then the jury is entitled to give it whatever weight, in its judgment, is warranted.[5] The trial justice thus did not err in allowing the economics expert to testify, as to predicted future growth of wages due to economic conditions for the benefit of the jury's assessment of damages.

---

[5] The federal courts have conflicting views on the speculative nature of testimony on the effects of inflation. *See United States v. English*, 521 F.2d 63 (9th Cir.1975) (and cases cited at 73–74). We think the better view is to let the trier of fact take into account economic trends in determining damage awards—both as to increases in wages, and present value of future payments.

*Markham* is still the law with regard to inflation.

The government also looks for support to *Turcotte v. Ford Motor Co.*, 494 F.2d 173 (1st Cir.1974). This case was decided before *Markham*.

In *Turcotte*, the First Circuit did not refuse to allow adjustment for inflationary factors as the defendant alleges. In pertinent part, the court said:

We next turn to Ford's contentions concerning the accounting at trial for future inflation and productivity increases.

\* \* \* \* \* \*

However, the record is unclear as to precisely how [the expert] made his final adjustments for inflation and productivity. We cannot tell whether in fact he made the error which Ford suggests.

It does seem clear, however, that the Rhode Island damages statute does not require adjustments for inflation and productivity to be made only *after* projected earnings are reduced to present value. The sentence in paragraph 3 of § 10–7–1.1 which authorizes

consideration of "economic trends," *see* n. 14, is best interpreted as a general observation on the overall computation process. Therefore, to avoid the possibility of error suggested above, we think it advisable, upon remand, that decedent's projected lifetime earnings and expenses be adjusted to reflect future inflation and increases in productivity *before* the final net earnings figure is reduced to present value.

*Id.* at 186 (emphasis in original).

The *Turcotte* court remanded the case ordering that adjustments for future inflation be made before the final net earnings figure was reduced to present value, and not because inflationary factors were considered.

The government, for further support, cites *Caron, supra,* and *Foskey v. United States*, 490 F.Supp. 1047 (D.R.I.1980). Both *Caron* and *Foskey* are inapposite. Rhode Island law did not apply to either of these cases. In *Foskey*, the substantive law was that of the Commonwealth of Pennsylvania, 490 F.Supp. at 1065; the law in Pennsylvania unequivocally stated that inflation could not be considered. *Id.* It is true that in *Foskey*, I also looked to federal law for guidance on future inflation, in light of the plaintiff's argument that "state law merely controls the recoverable items of damages," not the amount or method of calculating each recoverable item. *Id.* at 1065. And because the Third Circuit provided no guidance as to whether inflationary factors should be considered, I looked to *Williams v. United States*, 435 F.2d 804 (1st Cir.1970). Since *Williams*, like Pennsylvania, rejected the use of inflationary factors, I refused to take inflation into account in *Foskey*. 490 F.Supp. at 1065–66.

Nevertheless, the *Williams* court's holding that anticipated future earnings could not be increased by some inflationary multiple is not controlling here. As the plaintiffs pointed out in argument, *Williams* was decided "before the Rhode Island Supreme Court had given its approval of inflationary consideration in *Markham* and under a different wrongful death statute

than that discussed in *Turcotte*. Unlike the *Turcotte* statute, the statute in *Williams*, which had to be strictly construed, did not expressly allow for the consideration of inflationary factors."

Furthermore, it is important to note that the Rhode Island legislature responded directly to the *Williams* decision: it amended the Rhode Island death statute to make clear that expenditures for the support of the decedent's dependents were to be disregarded and that evidence of inflationary and deflationary factors could be considered; so that we can say with veritable certainty that both this state's legislature and this state's highest court have approved the consideration of inflation in projecting future lost earnings under Rhode Island law.[2]

Consequently, even if inflation is found to have been considered by the plaintiffs' expert in making their projections, it would not negate their calculation. In fact, the plaintiffs' experts only "considered" inflation insofar as they excluded inflationary factors from both the estimate of lost earnings and the discounting to present value, as explained in part III, B, 1, d, *infra*.

### c. Use of Wrong Tables

Another objection by the government is that the plaintiffs, in their computation, erroneously used life expectancy tables instead of work life expectancy tables as they should have. It cites in support, R.I. G.L. § 9–19–38 as amended.[3] It argues that

> [t]he act without question makes a specific distinction as to what tables are used when determining life expectancy and work life expectancy ... [t]here is a distinction. *Pray v. Narragansett Improvement* [434 A.2d 923, 930 (R.I. 1981)]; *Gonyer v. Russell*, 160 F.Supp. 537 (U.S.D.C.R.I.1958),—cited in *Pray; Williams v. United States*, 435 F.2d 804 (1st Cir.1970)....
>
> It is clear that earning capacity in a personal injury (medical malpractice) case, is equated with "work life" expectancy.

Defendant's post-trial reply memorandum at 7.

I find it rather difficult to understand why this argument is being made. Unless I have misread the evidence, the plaintiffs' experts did base their calculations on

---

**2.** The defendant also relies on *D'Ambra v. United States*, 481 F.2d 14 (1st Cir.1973). In that case, the First Circuit found that the method for computing damages under the Rhode Island death statute, R.I.G.L. § 10–7–1.1, was punitive in nature (Rhode Island's "estate statute does not substitute, for the benefits provided by survivors' statutes, the value of the decedent's estate which might be expected to be accumulated, but results in receipt of both." *Id.* at 16). The court did not comment on the statute's allowance of inflationary considerations, and thus cannot be deemed to have held that inflationary factors cannot be considered. The case simply has no application here, especially not at this date.

**3.** § 9–19–38. Proof of life or work life expectancy.—

(a) In any proceeding commenced in any court, commission or agency when the life or work life expectancy of a person shall be at issue or when it is necessary to establish the expectancy of continued life or work life expectancy of any person from any period of such person's life, whether he is living at the time or not, the most recent issue of "The Vital Statistics of the United States (Life Tables)" or "Tables of Working Life of the United States" Department of Labor, Bureau of Vital Statistics shall be admissible in

evidence as competent evidence of such matter. The admissibility of evidence provided for in this section shall not be deemed to render inadmissible evidence as to the health, constitution, habits, or occupation of such person or any other evidence otherwise admissible under the laws of this state.

(b) Such life tables may be evidenced by an official publication thereof or by a copy attested to by an officer or agent of the United States department of health and human services, the state law librarian or his duly designated assistant, or any librarian whose library is a depository for United States government documents. Said tables shall be authenticated by the seal of such department or library without further foundation or authentication; provided, however, that written notice of the intention to offer such life tables as such evidence, together with a copy thereof, has been given to the opposing party or parties, or to his or their attorneys, by mailing the same by certified mail, return receipt requested, not less than ten (10) days before the introduction of same into evidence, and that an affidavit of such notice and the return receipt is filed with the clerk of the court forthwith after said receipt has been returned.

"work expectancy" and not on "life expectancy." This is clearly set forth in plaintiff's reply brief at 50–51:

> In Heather's case, the economists assumed her *work* expectancy would be from age 22 to age 70, retirement age. [Tr. of 11/25/86, at 37–38 (Green); Tr. of 11/26/86, at 45 (Wright).] Heather's *life* expectancy is 78–79 years. [Tr. of 11/25/86, at 51 (Green); Tr. of 11/26/86, at 45 (Wright).] The economists also calculated Mrs. Reilly's work expectancy up to retirement age. [Tr. of 11/25/86, at 41–42 (Green); Tr. of 11/26/86, at 49 (Wright).]

(emphasis in original). I interpret this testimony in the same way.

The government's expert also assumed Heather's and Mrs. Reilly's work expectancy extended to age 70. Although the government's expert thereafter reduced the work expectancy by 40%, I have found this latter reduction unacceptable, for reasons discussed in part III, B, 1, e, *infra.*

Finally, the government's legal arguments are misplaced. I fail to see how an evidentiary statute, section 9–19–38 applies to this case, and even if it did, where it mandates the use of any specific tables, or supports the defendant's expert's reduction of work expectancy by 40%. The very cases cited by the defense do not support its position.

### d. Discounting Methods

The defendant's last objection concerns the methodology of the plaintiffs' economists in discounting the projected stream of future earnings to present value. It maintains that the method chosen by the plaintiffs' economists violates the teachings of *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). I disagree.

*Jones & Laughlin* involved a personal injury suit brought by a coal barge employee against the barge owner under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b). In awarding damages, the district court had applied the forum state's "total offset method" of projecting and discounting the

plaintiff's lost future income. Under local law, the total offset method presumed that future inflation would be equal to the relevant future interest rates. Since this presumption meant that the two factors would cancel each other out, the court left both factors out of its calculations: the projected future income stream was not multiplied by an inflation rate, and the resulting stream of income was not discounted by an interest rate. The Third Circuit Court of Appeals affirmed. 678 F.2d 453 (3d Cir. 1982).

The Supreme Court vacated the damages award and remanded for further consideration, instructing the district court to "make a deliberate choice" in its method of discounting, "rather than assuming that it is bound by a rule of state law." 462 U.S. at 553, 103 S.Ct. at 2558. Earlier in its opinion, the Supreme Court had noted that calculating the present value of future damages involves two steps: estimating the future stream of money; and discounting the future stream to present value. 462 U.S. at 537–38, 103 S.Ct. at 2551. Later, in requiring the district court to choose an appropriate federal rule for dealing with the consequences of inflation, the Supreme Court sketched out certain guidelines to govern these calculations. These are well summed up by the plaintiffs in their memorandum of May 22, 1987 relevant to Dr. Wright's testimony ("plaintiffs' Wright memorandum") at 2:

> [I]f in estimating the relevant future [money] stream, inflation is factored into the calculation, then the chosen discount rate must also include an inflationary factor. On the other hand, if in estimating the relevant future stream, inflation is not factored into the calculation, then the discount rate must likewise be inflation free. [462 U.S. at 547–48 [103 S.Ct. at 2556]]. In other words, the basic guideline established by the Supreme Court is that both steps of the process must treat inflation in the same way.

In *Jones & Laughlin,* which focused on lost future income, the Supreme Court described three alternative methods of calculating lost income that fall within these

guidelines. First, if the future income stream is adjusted upward to reflect the consequences of inflation, "then the proper discount rate would be the after-tax market interest rate." 462 U.S. at 547–48, 103 S.Ct. at 2556. This market-rate discounting method takes account of inflation at both ends of the calculation, because existing rates of return are already adjusted upward by the market to reflect anticipated price inflation. 462 U.S. at 538–39, 103 S.Ct. at 2551.

Second, if the income stream is not adjusted upward to reflect anticipated inflation, then the court must discount the income stream with a below-market rate that does not incorporate the marketplace's inflationary expectations. 462 U.S. at 548, 103 S.Ct. at 2556. This below-market rate, also known as the "real" interest rate, is obtained by subtracting the anticipated inflation rate from the appropriate market rate; according to the Supreme Court, judges applying this method should "adopt[ ] a rate between 1 and 3%...." 462 U.S. at 549, 103 S.Ct. at 2556.

Third, as a variation of the second alternative, the Supreme Court approved the "total offset" method of calculating future income losses. As described by the Court, this method presumes that the market interest rate equals the sum of the anticipated inflation rate and the anticipated productivity growth rate, such that the latter two trends combine to offset the effects of the market interest rate. 462 U.S. at 449–50, 103 S.Ct. at 2557. To apply this method, a court must estimate the future income stream assuming both zero inflation and zero societal productivity growth; then, no discounting whatsoever is needed to obtain the present value of the future income stream.

In this case, it is abundantly clear from the record that the plaintiffs applied the second of the three methods approved in *Jones & Laughlin*, i.e., the below-market rate discounting method. The plaintiffs presented two economists to testify as to the present value of Heather's lost earning capacity: Dr. Jerry Green from Harvard University and Dr. Arthur Wright from the University of Connecticut. Consistent with the approved below-market rate discounting method, Dr. Green testified that he excluded inflation both from the lost future income estimate and from the rate used in discounting that estimate to present value:

> I think it's important to point out that since *I didn't include a factor for inflation in the cost projection* then the correct method of discounting that to the [present] is to use a *net of inflation interest rate*, so all that is internally consistent.

Tr. of 11–25–86 at 61–62 (Green) (emphasis added). Dr. Wright likewise testified as follows:

> Q. Mr. Sammartino kept asking you about whether you took inflation into consideration. Is it a fair statement that you took inflation into consideration by being sure that *your calculations were inflation free?*
>
> A. *Yes.*
>
> Q. By *deducting inflation so that your calculations would not be affected by it?*
>
> A. *At every step, both sides.*

Tr. of 5–5–87 at 63 (Wright) (emphasis added); *accord,* Tr. of 4–16–87 at 58 (Wright).

The plaintiffs' experts consistently followed *Jones v. Laughlin* not only in their general methodology, but also in their particular choice of a discount rate. As indicated above, the Supreme Court provided the following guideline with respect to the below-market discount rate method: "we do not believe a trial court adopting such an approach ... should be reversed if it adopts a rate between 1 and 3% and explains its choice." 462 U.S. at 548–49, 103 S.Ct. at 2556. Here, Dr. Wright used a 2% real after-tax rate of interest and explained his choice as follows:

> As an estimate of the real rate of interest, I have used two percent—by the way this is *real after tax rate of interest.* The basis for that is as follows: ... I'm going to define the real rate of interest as the *nominal rate of interest* on a one year treasury debt instrument, a one year treasury note, and ... *I want to*

*deduct from that the expected rate of inflation* over the same period, so that if I have a one year treasury note, I want to get some measure of expected rates of inflation on one year intervals. There is a source of data time series on expected rate[s] of inflation that is maintained and published by something called the Livingston Survey, and the Livingston Survey has found that over a long period the estimated real rate of interest according to this technique has been something over 2 percent. Something between 2 and 2 and ½ percent. *If we then adjust roughly speaking by 25 to 30 percent for the federal tax liability on that, the result is about 2 percent, and so I discounted all of the net earning capacities at 2 percent per year as the real rate of interest.*

Tr. of 11–26–86 at 42–43 (Wright) (emphasis added); *accord,* Tr. of 5–5–87 at 39–41 (Wright); Tr. of 4–16–87 at 55–56 (Wright).

In spite of *Jones & Laughlin*'s clear approval of, *inter alia,* the below-market rate discounting method, the government maintains that its adoption by this Court would be error. First, the government asserts, "[i]t is obvious from the Court's discussion, especially in the footnote [at 462 U.S. 523, 542, 103 S.Ct. at 2553], that this approach is not the best...." Defendant's Wright memorandum at 6. In fact, the Court noted only that "a slight distortion" may result from below-market rate discounting, 462 U.S. at 542–43, n. 26, 103 S.Ct. at 2553, n. 26, whereas later in its opinion, the Court indicated a clear preference for either the below-market rate method or the total offset method, as against the market-rate discounting method. Market rate discounting "will normally be a costly and ultimately unproductive waste of ... resources ... [such that] both plaintiffs and trial courts should be discouraged from pursuing that approach." 462 U.S. at 548, 103 S.Ct. at 2556.

Second, the government cites a series of cases in support of the proposition that "Courts in this Circuit, and others have prohibited an adjustment for inflation when computing the discount figure, especially in Federal Tort Claims [c]ases." Defendant's

Wright memorandum at 11–12. The government's strongest authority on point is *Williams v. United States,* 435 F.2d 804 (1st Cir.1970), which held that adjusting future earnings projections by some inflationary multiple constitutes inadmissible speculation, *id.* at 807. This case, like all the others cited in the government's memorandum, was decided before *Jones & Laughlin* and as such can no longer be considered authoritative. Had *Jones & Laughlin* merely deemed inflation to be a permissible factor in setting discount rates, then the government's argument from *Williams,* et al. might warrant closer scrutiny. But *Jones v. Laughlin* appears to have held that where inflationary trends are left out of the initial future damages estimate, then they *must,* if proved by sufficient evidence, be subtracted from the discount rate: the Court prefaced its summary of the three alternative discounting methods by stating, "we shall define the general boundaries within which a particular award will be considered legally acceptable." 462 U.S. at 547, 103 S.Ct. at 2555.

In light of the foregoing, I cannot accept the government's contention that, under *Jones & Laughlin,* the court must adopt an inherently inflated market rate of "somewhere around 6%" in discounting the damages award to present value. Defendant's Wright memorandum at 12. This contention, coupled with the government's previously discussed argument that inflation may not be factored into the estimation of lost future income, constitutes advocacy of the precise inequity that the *Jones & Laughlin* court sought to eliminate from future damages awards; the government's position, as the Supreme Court described it, would "deny the plaintiff the benefit of the impact of inflation on his future earnings, while giving the defendant the benefit of inflation's impact on the interest rate that is used to discount those earnings to present value ... [This] inequity can no longer be tolerated." 462 U.S. at 540–41, 103 S.Ct. at 2552.

Both the clear reasoning of *Jones & Laughlin* and common sense principles of fairness require that I approve the dis-

counting method used by the plaintiffs' expert economists.

### e. The Economists' Calculations of Lost Earning Capacity

Having disposed of the defendant's specific objections to the plaintiffs' methodology, I can proceed to review the actual calculations of the parties' economic experts. Three distinguished economists testified. As discussed previously, two economists testified for the plaintiffs: Dr. Jerry Richard Green, a professor and chairman of the Department of Economics at Harvard University; and Dr. Arthur N. Wright, a professor and chairman of the Department of Economics at the University of Connecticut. One economist testified for the defendant: Dr. Joseph P. Mooney, a professor and former chairman of the Economics Department at LaSalle University. All three have written and published many scholarly works and are recognized as authorities in this discipline, which can be as complicated as the cybernetics of the most sophisticated computers. Dr. Mooney is in disagreement with only "some aspects" of the procedures used in calculating the plaintiffs' claimed damages. In this section, I will compare the calculations of Doctors Wright and Mooney to resolve the question of lost earning capacity for Heather. Later, I will discuss the calculations with respect to the medical expenses.

I begin by noting certain assumptions, based on the Reilly's educational and economic background, that were shared by all three economic experts: Heather would complete four years of college; she would enter the labor force in the year 2007 at age 22; and her work capacity would extend to age 70. The defendant's economists further assumed that Heather would not work 40% of that time; this is discussed, *infra*.

The plaintiffs' economists performed separate calculations for each of Heather's 48 years of lost earning capacity, through a process that may be summed up as follows: gross earnings for the particular year were first estimated; net earnings for the year were determined by deducting taxes and adding fringe benefits; finally, the year's net earnings were reduced to present value. The sum of these 48 separate calculations yielded the present value of Heather's net lost earning capacity.

In calculating gross earning capacity for each of Heather's lost work years, Dr. Wright relied on Bureau of the Census figures relevant to workers of Heather's projected age and educational level. Since all this was based on 1984 figures, a 2% productivity growth rate was factored into each year to be considered. Interstitially, it should be pointed out that productivity-based wage increases are separate and distinct from inflation-adjusted wage increases, as explained at some length in the discussion of future nursing care at part III, B, 2, a, iii, *infra*. Because the defendant objects to the use of a productivity factor only in the cost estimates of future nursing care and not in the calculation of lost future earnings, *see, e.g.*, defendant's Wright memorandum at 4, I need not discuss further Dr. Wright's use of a 2% productivity factor here. In fact, the defendant's economist used the same 2% productivity factor in his calculation of lost earning capacity, as discussed *infra*.

From the gross earning figure thus determined, the next step was to estimate the federal and state tax liability. Here again, certain assumptions about the family circumstances had to be made in order to compute a tax figure; these assumptions were made from U.S. Census publications and they were that Heather would very likely have married at age 22, have about two children, spaced about two years apart, and it was further assumed Heather would have married a man of the same age and the same educational attainment. With this information, the family taxable income was estimated—tax calculations were made as if the family filed a tax return in each year for both state and federal taxes; from the total tax, an apportionment was made to Heather in the same proportion as she would have contributed to the family's gross income. In this procedure, fringe benefits were factored into the computations; to do this, the witness used a study that is put out annually by the U.S. Cham-

ber of Commerce. The end result of this process was a determination of Heather's gross earnings from which were deducted federal and state taxes to which remaining figure was added the fringe benefits, thus computing Heather's net earning capacity in each of her work life years. All of the net earnings were then discounted to present value at 2% percent per year.

By way of example, for the first year:

Q. Will you take the first year and run through the calculations you made so that the Court can have an idea in terms of the figures that you used?

A. Yes. I should mention that in that first year, that would be, I assume that she would work only half of the actual calendar year, having graduated from college in about May or June.

Q. Tell us the first full year.

A. The first full year would then be 2008....

\* \* \* \* \* \*

A. Her age during that year, most of that year, would be 23. The census earnings applicable to Heather at age 23 were $15,847. When I adjust that for the productivity increase of 2 percent, the real productivity increase, 2 percent per year, her estimated gross earnings were $25,589. I then go through the tax calculation.

\* \* \* \* \* \*

The tax calculation has a lot of columns. Do you want all of the details? It involves her husband's assumed census earnings.

Q. I want the bottom line.

A. His gross earnings? Let me just do her income tax which is arrived at through the series of steps that I described.

Q. Okay, fine.

A. We have her gross earnings, and then through the process of adding the husband, calculating family income, calculating taxable income, estimating the taxes and then apportioning those taxes to Heather, her income tax in that year 2008 would have been $4,465. That gives after tax earnings of $21,-124. Her fringe benefits estimated at 25.6 percent of her gross earning capacity that year, would have been $6,551. Then we, by adding her fringe benefits to her after tax earnings, her net earnings, net earning capacity in 2008, would have been $27,675. Discounting that back to the middle of October 1986, at 2 percent real rate of interest per year, the present value of that would have been $18,004.

Q. And is that the process you used in each year through the end of your calculation?

A. Yes, it is.

Q. And how long did you attribute to Heather for working? How many years?

A. I assumed that she would have worked through her 69th—I'm sorry, through her 70th birthday, through her 69th year.

Tr. of 11–16–86 at 43–45 (Wright).

From the foregoing computation, Heather's total loss of earning capacity, reduced to present value, is $1,104,641.

To refute Dr. Wright's calculation, the defendant at the time of the first hearing rested its entire case on the testimony of Dr. Mooney. Dr. Mooney also assumed Heather would graduate college, start working at age 22 and continue to do so until age 70. To determine her salary at age 22, he started with $16,400, the average salary for females with four years of college; this was then adjusted by a 2% productivity factor, yielding a figure of $24,350 as her starting annual salary (Dr. Wright arrived at a figure of $25,589); this was reduced by $3,700 for state and federal taxes (Dr. Wright's computation for taxes was $4,465) giving a net of $20,650 (Dr. Wright's net was $21,124), a difference of $474. To this net figure, he added fringe benefits of $4,870, resulting in an estimate of $25,520 (Dr. Wright added fringe benefits of $6,551 for a final figure of $27,675) as Heather's net earning capacity. The difference between Dr. Wright's and Dr. Mooney's figures for net earning capacity is $2,155. In the complexities of economic projections, this difference is not dramatic.

As I understand Dr. Mooney's testimony, he proceeded exactly as Dr. Wright: he discounted to 1986 at 2% and arrived at a figure of $1,224,900. At this point, Dr. Mooney's figure was $120,259 higher than Dr. Wright's. However, Dr. Mooney then further discounted from the year 2008 to 1986 at 7%. In other words, from 2008 to 1986, he discounted at 9%, without any justification that I can discern. And he did this 9% discount after first reducing Heather's earnings by 40% because work life tables published by the Bureau of Labor Statistics show that a female with 15 or more years of education would be active in the labor force for 28 years, and 28 years out of the remaining 48 years until age 70 is approximately 40%. The combined effect of these further calculations—reducing the net earnings total by 40%, and discounting it by an added 7% from 2008 to 1986—brought the present value of Heather's net lost earning capacity down to $316,500.

I cannot accept Dr. Mooney's reduction of Heather's estimated working life by 40%. The reduction relies solely on a survey of women's work histories between 1978 and 1980. Tr. of 11–26–86 at 191 (Mooney). As a factual matter, I seriously doubt the probative value of such a statistic with respect to twenty-first century women's employment patterns, particularly in light of current, ongoing changes in women's labor force participation rates. As a matter of law, moreover, I know of no case authority and none has been cited to me supporting Dr. Mooney's 40% reduction. On the contrary, both federal and state authorities within the jurisdiction counsel against such disparate treatment. *See Caron v. United States*, 548 F.2d 366, 371 (1st Cir.1976) (In awarding damages for lost earnings, "we see no reason to distinguish between the sexes...."); *Taft v. Cerwonka*, —— R.I. ——, 433 A.2d 215, 219–20 (1981) (affirming trial court's unreduced award of 41.2 years' lost earnings on behalf of female decedent).

I also cannot accept Dr. Mooney's use of a 7% discount rate between the years 2008 and 1986. It is not entirely clear from the transcript whether Dr. Mooney discounted at 2% to the year 2008 and then discounted to 1986 at 7% or, as stated above, discounted at 2% to 1986 and then discounted again at 7% from 2008 to 1986. In either case, the procedure runs counter to the rule of *Jones & Laughlin, supra*, requiring both the future income projection and the discounting to present value to treat inflation in the same way.

By his own admission, Dr. Mooney's estimates of Heather's year-by-year gross earning capacity were adjusted upward by a 2% productivity factor, tr. of 11–26–86 at 193–94 (Mooney), but not by a cost-of-living inflation factor. *Id.; see also* tr. of 11–26–86 at 178–79 (Mooney) (distinguishing salary increases for increased worker productivity from salary increases that compensate workers for inflation). Under the guidelines established in *Jones & Laughlin, supra*, Dr. Mooney should have discounted this inflation-free income estimate with an inflation-free interest rate. Instead, he used "a 7 per cent discount rate ... [which] is the rate of return on safe investments today...." Tr. of 11–26–86 at 112 (Mooney). Since existing market rates incorporate the financial markets' inflationary expectations, *Jones & Laughlin, supra*, 462 U.S. at 538–39, 103 S.Ct. at 2551, Dr. Mooney's failure to take inflation out of his 7% discount rate renders his present value calculation deficient as a matter of law.

In light of these considerations, I find that the plaintiffs' expert economists correctly calculated the present value of Heather's lost earning capacity. I therefore award the plaintiffs $1,104,641 for this item.

### 2. *Future Care*

The expenses the plaintiffs seek for future care have been itemized at the beginning of part III, *supra*. I will discuss these items under three separate headings: home care from 1986–2025; residential care from 2026–2064; and case manager services that are requested for the duration of both the home care and residential placement periods. I must emphasize that my review here will focus solely on the necessi-

ty and, where disputed, the cost calculations of the various future care items requested. I will discuss in subsequent sections the various legal arguments that the government has raised concerning the plaintiffs' entitlement to the items found otherwise awardable, and the method by which the future care damages shall be paid out.

Before separately reviewing the necessity for each future care item, there are four preliminary matters that must be discussed. First, I should make clear at the outset that future care expenses resulting from tortious conduct are compensable under Rhode Island law. *See Markham v. Cross Transportation, Inc.*, 119 R.I. 213, 228, 376 A.2d 1359, 1367 (1977); *see also Houlihan v. Turner Construction Co.*, 139 F.Supp. 88, 92 (D.R.I.1956), *aff'd*, 240 F.2d 435 (1st Cir.1957). Most of the items requested have been the subjects of specific awards in jurisdictions that recognize future care expenses; these include awards for home architectural modifications, *Barnes v. United States*, 516 F.Supp. 1376, 1385–86 (W.D.Pa.1981), *aff'd in part*, 678 F.2d 10 (3d Cir.), *and aff'd*, 685 F.2d 66 (3d Cir.1982), special beds and treatment equipment, *Foskey v. United States*, 490 F.Supp. 1047, 1065 (D.R.I.1980) (supp. op.), medical tests and supplies, *Wright v. United States*, 507 F.Supp. 147, 162 (E.D.La.1981), wheelchair and van, *id.* at 162–63, round-the-clock lifetime nursing care, *Johnson v. United States*, 704 F.2d 1431, 1442 (9th Cir.1983); *Foskey, supra*, at 1063, professional therapeutic services, *Powers v. United States*, 589 F.Supp. 1084, 1103–04 (D.Conn.1984); *Wright, supra*, at 163; *Foskey, supra*, at 1083, residential placement expenses, *Caron v. United States*, 410 F.Supp. 378, 393–95 (D.R.I.1976) (supp. op.) and case manager services, *Nemmers v. United States*, 612 F.Supp. 928, 935 (C.D. Ill.1985), *vacated on other grounds*, 795 F.2d 628 (7th Cir.1986). Some of the other requested items have not been specifically addressed by the available authorities; where such items are less clearly linked to Heather's future care, they may require further scrutiny on the legal question of awardability.

A second preliminary matter concerns the introduction of the plaintiffs' exhibits 37 and 38, which supplied the basis for much of the expert testimony describing Heather's future care expenses. Exhibit 37, which details a home-based care program for Heather through the age of 21, was prepared by Raphael Minsky, a rehabilitation psychologist. Exhibit 38, which details Heather's care requirements beyond her 21st birthday, was prepared by Phillip Bussey, a rehabilitation counselor. The defendant objects both to these reports and to the testimony that relied on them, citing two reasons. First, the government contends that it suffered prejudice by having been denied sufficient time to complete discovery and prepare its defense with respect to the rehabilitation and economic experts. Second, the government argues that the rehabilitation experts' reports and any testimony based upon them were inadmissible owing to the reports' authors' lack of expert qualifications.

To assess the first of these contentions, it is necessary to review the travel of the litigation. The sequence of relevant events is as follows:

On February 25, 1986, the defendant requested the names and addresses of the experts the plaintiffs intended to call and the substance of their testimony.

On April 8, 1986, the plaintiffs answered by saying the experts had not been retained but that the information would be provided in supplemental answers.

On August 22, 1986, the court entered an order closing discovery on October 15, 1986 and scheduling trial for October 27, 1986.

On October 14, 1986, the plaintiffs delivered supplemental answers to the office of the defendant's counsel; these answers listed the names of seventeen experts the plaintiffs intended to call as witnesses.

On October 23, 1986, the defendant moved for reopening of discovery and for a delay of trial so that it might have an opportunity to depose the plaintiffs' experts Minsky, Bussey and Wright.

On October 24, 1986, there was a hearing on the motion before the magistrate; at

this hearing, defense counsel waived taking depositions of the plaintiffs' doctors and stated he was not interested in any reports from the plaintiffs' rehabilitation experts, Minsky and Bussey. He specifically acknowledged he only wanted a statement from the economist—he wanted to depose the economist even though his own economist had spoken to and questioned the plaintiffs' economist the day before. What is particularly confusing is that defense counsel said he wanted to depose the expert relative to Mr. Reilly's lost wages—which have never been claimed and are not an issue in the case. At any rate, the defendant was given permission and did depose the plaintiffs' economists.

In light of defense counsel's expressed lack of interest in the rehabilitation experts' reports at the October 24, 1986 hearing, I see no merit in the government's contention that it was prejudiced by their introduction at trial. I reach the same conclusion with respect to the testimony of the plaintiffs' economists. As to the latter, the defendant further argues that it was not given the economists' work papers. This contention, although true, is insufficient to support a claim of prejudice, at least within the context of the defendant's lack of efforts to obtain them. Defense counsel never filed a request for production, nor did he seek access to the economists' work sheets on cross-examination. In short, the defense counsel's failure to obtain the reports of which he complains cannot be attributed to his lacking an opportunity to conduct full discovery.

The defendant's second argument against the admissibility of the Minsky and Bussey reports rests on the contention that the reports' authors were insufficiently qualified as experts regarding the subject-matter of the reports. Tr. of 11–20–86 at 56 (Sammartino). Raphael Minsky is a rehabilitation psychologist with a doctorate in Special Education, which is a discipline focusing on "the educational process of handicapped children." Tr. of 11–21–86 at 1, 4 (Minsky). He has held numerous positions in both government and academia dealing with the evaluation of handicapped children's needs, id. at 7–18, and has partici-

pated in over 1,000 multi-disciplinary evaluations of handicapped children, generating care and treatment plans analogous to the one prepared for Heather Reilly. Id. at 18, 20–21. Phillip Bussey described himself as a rehabilitation counselor, holding a doctorate in this field. Tr. of 11–25–86 at 111. He has performed rehabilitative evaluations for between 8,000 and 9,000 people, id. at 118, and currently specializes in rehabilitative counseling for the "severely impaired." Id. at 119.

Based on the extensive testimony regarding these two individuals' training, experience and career specialty, I accept that rehabilitative counseling is a recognizable field of professional expertise, and I readily deem Drs. Minsky and Bussey to be qualified as experts within this field. As such, they are allowed under Fed.R.Evid. 703 to present testimony based upon hearsay information, "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...."

The question of the admissibility of the Minsky and Bussey reports thus turns on whether the hearsay information incorporated in them may be deemed "of a type reasonably relied upon by experts" in the field of rehabilitation counseling. Each of the reports performs two functions: evaluating Heather's physical and mental capacities, along with the secondary effects of her handicaps upon Mr. and Mrs. Reilly; and proposing a comprehensive care and treatment plan designed to facilitate Heather's optimum possible physical and mental development. The Bussey report serves largely as a continuation of the Minsky report beyond Heather's twenty-first birthday and thus, in its evaluative sections, relies significantly upon consultations with Dr. Minsky and the latter's evaluative findings. My focus is therefore upon the factual bases of the Minsky report.

Dr. Minsky relied on four types of data sources for his evaluation: reports by physicians who treated and diagnosed Heather; reports by and interviews of child development specialists who worked with Heather; interviews of Mr. and Mrs. Reilly; and his

own observation and testing of Heather. *See* exhibit 37 at 2. Reliance upon these sources is consistent with the multi-disciplinary approach to rehabilitation evaluation and planning described by both Drs. Minsky and Bussey. Tr. of 11–21–86 at 9, 14–15, 17–18 (Minsky); tr. of 11–25–86 at 113–14, 119 (Bussey). Insofar as the hearsay sources are regularly relied on by experts in the rehabilitation field, the only remaining question is whether they are "reasonably" relied on for purposes of Fed. R.Evid. 703.

I do not regard Dr. Minsky's reliance on his hearsay sources to be unreasonable, at least insofar as the reliance is limited to each source's trustworthy areas of knowledge, i.e., medical diagnoses from the physicians, developmental prognoses from the child development specialists and narrative descriptions of Heather's personal history, behavior patterns and daily care cycles from Mr. and Mrs. Reilly. Except perhaps for Mrs. Reilly's somewhat technical narrative of Heather's needs, *see* exhibit 37 at 19–20, the evaluative portions of Dr. Minsky's report incorporate the appropriate areas of knowledge of the respective hearsay sources. Because the less reliable portion of Mrs. Reilly's narrative appears merely to duplicate the conclusions reached by the many expert sources, I do not find her comments so significant as to impeach the reliability of Dr. Minsky's evaluation.

With one exception, I also find that Dr. Minsky reasonably relied upon hearsay sources in the proposed future care portion of his report. Here, the only hearsay consists of price quotations for the various personal care services and material items included in the care program. With respect to the services and equipment that are customary elements of a rehabilitative care program, Dr. Minsky's ability to obtain reliable price quotations is a valid evidentiary presumption. As the Court of Appeals for the Fifth Circuit once explained:

It has long been the rule of evidence in the federal courts that an expert witness can express an opinion as to value even though his opinion is based in part or solely on hearsay sources. The rationale

for this exception to the rule against hearsay is that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion.

*United States v. Williams,* 447 F.2d 1285, 1290 (5th Cir.1971), *cert. denied,* 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972) (citations omitted). The only price quotation that I cannot presume to lie within the expertise of a rehabilitation expert is the valuation of a ranch-style home. *See Wilder Enterprises v. Allied Artists Pictures Corp.,* 632 F.2d 1135, 1143–44 (4th Cir. 1980). Accordingly, as noted in part III, B, 2, a, ii, *infra,* I conclude that Dr. Minsky's reliance upon a realtor's price quotation goes beyond the scope of the hearsay exception embedded in Fed.R.Evid. 703.

Except for Dr. Minsky's real estate valuation, I conclude that exhibit 37 satisfies the requirements of Fed.R.Evid. 703, and that it was admissible into evidence as the work of a qualified expert. I make the same finding as to Dr. Bussey's report, exhibit 38, noting only that it would be unduly repetitive to state my reasoning, which is identical to the logic behind my decision to admit exhibit 37.

A third preliminary matter concerns the strategy of the defendant. Reluctantly, I am constrained to say that the way this case was defended by the government makes it particularly difficult and troublesome for the Court. Having relied almost exclusively on legal arguments against the plaintiffs' entitlement to the various damages claimed, the government presented almost no factual argument against the necessity for and pecuniary valuation of the itemized damages. Regardless what the result may be on appeal, the fact remains that nearly every item was factually uncontradicted. I do not wish to editorialize critically upon the defense counsel's performance, but certainly the Court was entitled to at least a modicum of help on each of the plaintiffs' itemized claims for future care, or else a concession by the government that they are awardable.

A fourth and final preliminary matter concerns the nature of the future care Heather is entitled to receive. Mr. and Mrs. Reilly prefer to take care of their daughter at home as long as they are physically capable of doing so. Tr. of 11–24–86 at 87, 95 (Peter Reilly); *see also* plaintiffs' post-trial brief at 33. The plaintiffs' experts have estimated that this period will last until Mr. Reilly's expected retirement in the year 2025; at that time Heather will be age 40, Mr. Reilly will be 65 and Mrs. Reilly will be 63. Plaintiffs' post-trial brief at 33. As is indicated in the Summary of Damage Findings, Part III, C, *infra*, there is a considerable difference between the cost of home care for Heather and the cost of her institutionalization. While the defendant does not demand that the Reillys institutionalize Heather prior to the year 2026, I believe that the vast differential in cost between home and institutional care necessitates some preliminary comments in support of the award of the home care items.

Mr. Reilly testified at trial that he and Mrs. Reilly desired to care for Heather in their home. Tr. of 11–24–86 at 95, 105 (Peter Reilly). Mr. Reilly stated:

I do not want Heather institutionalized because she is my daughter. And on top of being brain damaged, blind, unable to walk, she can stay at home with her mother and father who love her every day and she can participate in and be part of the family. And it is not her fault that she is the way she is. She shouldn't have to loose [sic] her—her mother and father.

Tr. of 11–24–86 at 87 (Peter Reilly). The plaintiffs presented uncontested evidence that Heather's institutionalization before age 40 would inhibit her progress and could be injurious to her health. Dr. Vohr testified that if Heather was placed in an institution, "she would not progress. It is unlikely that she would progress, and the likelihood of developing a secondary infection would be greater, and I think her life expectancy would probably be shortened." Tr. of 11–21–86 at 124 (Vohr). Heather's special needs instructor at the Maher Center, Susan Hatch, testified that she did not recommend Heather's institutionalization because she had observed the progress Heather had made at home with her parents and because Heather would most benefit from a daily program that the Maher Center could not offer on a twenty-four hour basis. Tr. of 11–24–86 at 56 (Hatch). Finally, Dr. Shaywitz testified that Heather "will make more progress and more consistent progress and more long-lasting progress if she is at home." Tr. of 11–20–86 at 90 (Shaywitz).

It is evident from this testimony that placing Heather in an institution at this stage in her life would further damage this already tragically injured child. Moreover, requiring Heather's institutionalization would deprive the Reillys of the joys and rewards of parenting which may remain to them. I cannot accept that either Heather or her parents should suffer further damage in order to provide a less expensive method of compensation for this negligent defendant. Indeed, such a result would be unconscionable.

Having addressed these four preliminary matters, I now consider the future care items requested by the plaintiffs. I shall discuss the home care items first, the residential care items second and the lifelong case manager services last.

### a. Home Care Items: 1986—2025

The items requested for Heather's care at home through the year 2025 include the following:

| | |
|---|---:|
| Ranch-Style Home | $ 169,545 |
| Architectural Modifications, including Fees | 68,433 |
| Special Room Equipment | 16,716 |
| Treatment Equipment | 21,416 |
| Medications, Lab Tests and Special Products | 105,837 |
| Electric Wheelchair | 27,933 |
| Electric Wheelchair Maintenance | 15,093 |
| Modified Van | 115,659 |
| Van Operating Costs | 68,501 |
| Medical Support Services | 144,216 |
| Support Services: Heather | 1,054,286 |
| Support Services: Parents | 59,762 |
| L.P.N. Care | 5,753,853 |
| Babysitting | 179,426 |
| Respite Care | 92,859 |
| Rehabilitation Engineer & Equipment | 83,614 |

| | |
|---|---|
| Special Education Teacher | $ 361,364 |
| Total: | $8,338,513 |

### i. *Undisputed Items*

The government has conceded that, if liability is found, certain future care items are not in dispute. Defendant's post-trial brief at 50. These include the following, which I hereby grant:

| | |
|---|---|
| Architectural Modifications | $ 68,433 |
| Special Room Equipment | 16,716 |
| Treatment Equipment | 21,416 |
| Medications, Lab Tests and Special Products | 105,837 |
| Modified Van | 115,659 |
| Van Operating Costs | 68,501 |
| Medical Support Services | 114,216 |

### ii. *Ranch-Style Home*

The plaintiffs have requested a ranch-style home in addition to the architectural modifications that I have granted above. The logic of this combined request rests on Heather's extreme lack of mobility: she can be moved around far more easily in a ranch-style, i.e. single-level, home; and such a home can accommodate her special needs only if its entrances, doors, bath, toilet and other facilities are specially modified. Tr. of 11–20–86 at 63–64 (Shaywitz); tr. of 11–21–86 at 60–63 (Minsky); tr. of 11–25–86 at 132–33 (Bussey).

Although the alleged necessity for a single-level home went uncontradicted, *see* defendant's post-trial brief at 43, I cannot say that I am persuaded by a preponderance of the evidence to grant the $169,545 requested for it. In the first place, the plaintiffs introduced no evidence to demonstrate the inadequacy of the layout of their current home, nor any evidence as to why some form of lift or elevator could not adequately facilitate Heather's movement around their current home. All they can offer in this regard is Dr. Minsky's statement that "people have installed [elevators] for the purpose, but they are also extremely costly." Tr. of 11–21–86 at 60–61 (Minsky).

Second, the rehabilitative experts who recommended the provision of a ranch-style home were not qualified to testify as experts in the field of real estate. Consequently, the real estate price quotations on which they relied lie outside Fed.R.Evid. 703's allowance of a hearsay basis for expert testimony within the witness's particular field of expertise.

Not persuaded that a ranch-style home is necessary nor that the price quoted for it was supplied by a qualified expert, I decline to grant this item.

### iii. *Nursing Care*

The discussion which follows, as to this most substantial item of damages, demonstrates the Court's concern about the presentation of the defense. At page 3 of its post-trial reply memorandum, the defendant states that it "denies the plaintiffs are entitled to damages for ... LPN [Licensed Practical Nurse] nursing care for Heather". No testimony is offered to support this denial; outside of defense counsel's subjective argument, plaintiffs' testimony stands uncontradicted.

The record clearly establishes that Heather needs the level of LPN care 24 hours a day. The plaintiffs' experts testified that such care was necessary because Heather's problems needed special monitoring and expertise. Tr. of 11–20–86 at 28–33 (Shaywitz). Owing to her nervous system damage, Heather is especially vulnerable to choking during feeding, *id.* at 104–05; she has suffered and may continue to suffer brain seizures, which she can in no way prepare for, communicate about, or take positive action to recuperate from. As Dr. Shaywitz testified,

> [I]n patients who have a very damaged central nervous system, like Heather, the seizures ... are more ominous ... [I]f she has a seizure ... and there is nobody around who is trained to take care of that seizure, she can have complications from that seizure, as you mentioned, aspiration ... That is why I think medical indications mandate that you have somebody like an LPN around.

Tr. of 11–20–86 at 111–12.

Notwithstanding the state of the record, the defendant claims in its post-trial brief that this testimony is not controlling because Heather "has not had such level of attendant care in the past". This contention is of no consequence. To begin with,

the testimony established that Mrs. Reilly had acquired the skill of an LPN—but that is irrelevant. The issue is whether Heather needs LPN care, not whether she has survived thus far without it. Finally, the defense asserts LPN care costs should not be imposed for those periods when Heather is in school or receiving therapy. Even if true, this assertion is deficient as presented: if it is offered as argument, it is unsupported by any testimony yielding an alternative LPN cost estimate; and if it is offered as testimony, it is unacceptable as coming from the defendant's attorney, who is unqualified to be a witness. The uncontradicted testimony is that the cost of LPN care is $14.50 per hour and $15.25 per hour on weekends. This care is to be provided every day, round the clock through the year 2025, after which date Heather is to be placed in a residential home. The only question remaining is whether the plaintiffs' economists used the correct procedures in calculating the present value of such care.

In calculating nursing care expenses, as in all their calculations, the plaintiffs' economists declined to incorporate an inflation factor into the projected future money stream; then, in discounting the stream to present value, they used a below-market, inflation-free interest rate. I have discussed at length in part III, B, 1, d, *supra,* why these methods accord with the teachings of *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). The only argument not covered in that discussion is the defendant's objection to the inclusion of a productivity factor in the estimate of LPN expenses. Defendant's Wright memorandum at 4, 8–9.

It is true that the plaintiffs' economists incorporated a productivity factor in their cost estimate of future medical services. Tr. of 11–26–86 at 55 (Wright). But this does not contradict the Court's conclusion that inflation was kept out of the future cost estimate, because productivity is a factor separate and distinct from inflation. Productivity wage increases are based on growth in output per worker, whereas inflationary wage increases are based on factors other than output levels, such as the cost of living; as the defendant's own economic expert testified,

> [A]n increase in wages and salaries over time is generally the result of at least two factors, one an increase in the cost of living, and another as a result of an increase in the productivity or output of the worker ... [I]t's particularly easy to see this when you discuss workers who deal with physical products. If they increased their output per hour say 6 per cent in a year, an employer could increase their wage or salary by 6 per cent without any increase in labor costs. They would also get an increase on top of that as a result say of changes in the cost of living. The two basic factors are productivity and inflation.

Tr. of 11–26–86 at 178–79. Since the plaintiffs' economists factored only productivity and not inflation into their future cost estimates, they did not run afoul of *Jones & Laughlin* 's requirement that inflation-free discount rates be applied only to inflation-free cost projections.

Beyond the legal argument, the defendant's own evidence fails to support its attempted criticism of the plaintiffs' methodology. The plaintiffs' economists' procedures are not only uncontradicted but specifically agreed to by the defendant's economist. He testified, as part of the defendant's own case, as follows:

Q. And you have reviewed his [Professor Wright's] calculations relative to—excuse me, his projections for the cost of medical expenses for Heather Reilly in this case?

A. Not the actual calculations because I didn't see the details, but I did—I am aware of the technique, both from a discussion, telephone discussion with Doctor Wright and also a review of the deposition.

Q. Now, Doctor, I'm only talking relative to the *medical expenses involved.*

A. Yes, right.

Q. You understand that?

A. Yes.

Q. I'm not talking about the so-called lost earning capacity or lost wages, if you will, whatever we call them.

A. Yes.

Q. *Do you agree with Doctor Wright as to his calculations?*

A. *Yes. The—I see no other way of estimating other than the procedure that Doctor Wright did. If you project medical costs on the basis of what they are today into the future, I agree with his procedure.*

Q. So, talking about the estimates of caring, both residential in home caring and at a residential facility, institution, if you will, for Heather, you agree with Doctor Wright's calculations, is that correct?

A. *Yes, I agree with the procedure, yes.* I can't say that I agree with the calculations because I didn't actually work them out. I'm sure he did them correctly, *but I do agree with the procedure.*

Tr. of 11–26–86 at 106–07 (Mooney) (emphasis added). In light of such testimony, I can find no basis for challenging the plaintiffs' present value calculation of round the clock nursing care through the year 2025, and I therefore find the plaintiffs entitled to $5,753,853 for this item.

iv. *Electric Wheelchair and Wheelchair Maintenance*

Heather's permanent and total loss of the use of her arms and legs leaves me with no doubt as to the need for these items. No evidence was introduced to dispute either their necessity or valuation. Consequently, I find the plaintiffs entitled to the sums requested for them.

v. *Support Services: Heather; Special Education Teacher*

These two items cover a range of therapeutic services, along with incidental transportation costs, that will maintain Heather's muscle tone, provide her with sensory stimulation and develop her communicative skills to the extent that her abilities allow. The aggregated support services claim includes five items: physical therapy; occupational therapy; speech and language stimulation; educational, developmental and psychological evaluations; and travel expenses. Plaintiffs' exhibit 68, table 8.a. The defendant has offered no evidence challenging the need for these items or for a special education teacher.

Although at first glance some of these items may appear to be duplicative, the plaintiffs' evidence makes clear that they are not. Sustained physical therapy is necessary to prevent Heather's muscles from atrophying and locking in one position. Tr. of 11–21–86 at 136–37 (Vohr). Speech and language stimulation will help develop Heather's ability to communicate via sounds, tr. of 11–20–86 at 78 (Shaywitz), which presently is limited to crying; occupational therapy, by contrast, will help Heather to communicate via hand motions and the use of a switch mechanism, tr. of 11–21–86 at 137–38 (Vohr); tr. of 11–21–86 at 78 (Shaywitz). Ten hours per week of special education will provide Heather with sensory exercise and stimulation not otherwise generated by each of the more specific therapies, tr. of 11–21–86 at 85–86 (Minsky). Evaluative testing and transportation are simply prerequisites to the effective provision of these various therapies.

It is clear from the record that Heather stands a very good chance of benefiting from all these therapies despite the extreme neurological damage and physical incapacitation she has suffered. Heather has already developed specific "likes and dislikes"; as her mother testified,

> [S]he likes music. She likes to eat. She likes meats and vegetables. She likes bouncing, she likes patty cake. In fact, when I play patty cake with her is the time that she smiles. Whenever I want to see her smile we play patty cake. She hates fruit.
>
> . .. . . .
>
> She spits it back out at you. She makes faces like you would if you were eating lemon.

Tr. of 11–19–86 at 56 (Donna Reilly). Heather's manifestations of having devel-

oped specific likes and dislikes were also described by her current special education teacher. Tr. of 11–24–86 at 47 (Hatch).

The quality of Heather's life will be greatly affected by the degree to which she can communicate her pleasures and displeasures to her family and attendants; at the present time, she is able to experience itches and pains but can do virtually nothing to alleviate them. Tr. of 11–20–86 at 22 (Shaywitz). According to Dr. Shaywitz, a pediatric neurologist, Heather may develop the communicative ability to make such displeasures known to others:

> She will not talk, but I think that she will have some communication ... I don't think she will ever talk in the ... sense that you and I think of talking. Her communication, I think, can improve to a point where she is understanding her environment, and make her pleasure and displeasure known....

Tr. of 11–20–86 at 19 (Shaywitz).

In light of this evidence, I believe it is no exaggeration to conclude that the requested therapeutic and special education services can make the difference between Heather's enduring as a prisoner within her devastated body and her growing into a sentient individual capable of communicating with and seeking help from the world around her. I therefore find the plaintiffs entitled to these items.

#### vi. Rehabilitation Engineer and Equipment

The plaintiffs seek $83,614 to pay an engineer so that they might have an "[a]nnual consultation on new developments for the severely handicapped, including up to date modifications of existing equipment and new service offerings." Exhibit 37 at 54. This statement of need demeans the other serious damages established in this case. I cannot imagine such services not being offered by the sellers of such products. This item needs no further discussion; it is denied.

#### vii. Babysitting; Respite Care

This Court cannot appreciate the plaintiffs' claim for a total of $272,285 to accommodate Mr. and Mrs. Reilly's career aspirations, training needs, and psychotherapy needs, as well as time out from the stressful environment of parenting their [handicapped] child. This will provide the opportunity for them to spend one weekend night away from the home or to use for other specific purposes.

Plaintiffs' exhibit 37 at 54. With nurses provided around the clock, to say the least, I am not persuaded. These items are denied.

#### viii. Support Services: Parents

Mr. and Mrs. Reilly seek $59,762 for psychological counseling services, which they contend are necessitated by the stress of dealing with a child as handicapped as Heather. Without in any way meaning to trivialize the personal anguish suffered by the Reillys, I find the expert testimony regarding the need for psychological services to be deficient. No expert testified regarding Mr. and Mrs. Reilly's psychological condition; the nearest approximation of such testimony was supplied by Dr. Shaywitz's general statement that "having such a child with this degree of handicap is a terrible stress...." Tr. of 11–20–86 at 78 (Shaywitz). Without specifying any contextual circumstances, such a statement is of little use; certainly the stress experienced by the parents will vary according to the level of support services provided for Heather's care. More important, the stressfulness of the situation is not alone sufficient to determine whether and how much psychological counseling is needed; this depends on the particular psychological make-up of Mr. and Mrs. Reilly, about which no expert testimony was introduced. This item is denied.

#### b. Residential Care Items: 2026—2064

As explained in the previous section, the plaintiffs' experts have estimated that the Reillys will be able to care for Heather through the year 2025, after which time she will have to be placed in a residential institution. Based on Heather's life expectancy, the period of residential care has

been projected to last 38 years. During this period, the Reillys seek the following items:

| | |
|---|---|
| Medications, Lab Tests & Special Products | $ 24,711 |
| Electric Wheelchair | 12,419 |
| Electric Wheelchair Maintenance | 9,354 |
| Modified Van | 21,274 |
| Van Operating Costs | 19,363 |
| Medical Support Services | 118,145 |
| Support Services: Heather | 1,888,855 |
| Support Services: Parents | 24,085 |
| Home Visit Care | 388,105 |
| Rehabilitation Engineer & Equipment | 43,664 |
| Special Education Teacher | 354,849 |
| Full-Time Case Manager | 89,400 |
| Legal Guardian | 4,194 |
| Residential Care | 1,180,016 |
| Total: | $4,178,434 |

#### i. *Undisputed Items*

The government has conceded that, if liability is found, the cost of Heather's placement in a residential facility is not in dispute. Defendant's post-trial brief at 50. I therefore find the plaintiffs entitled to $1,180,016 for this item.

#### ii. *Electric Wheelchair; Wheelchair Maintenance*

Although the government introduced no evidence in support of its objection to these items, the plaintiffs have introduced no evidence showing that a residential home would not provide these most basic items of care. I cannot conceive of a residential facility lacking such equipment. If, alternatively, these items are sought for Heather's home visits, I am still not persuaded that they should be awarded, for reasons discussed in connection with the home visit care item, *infra*.

#### iii. *Home Visit Care; Modified Van; Van Operating Costs*

I know of no legal authority, and none has been cited to me by the plaintiffs, supporting home visitation costs as an item of damages in a situation such as this. I can only assume that the van items are sought for home visitation, and I therefore deny them along with the home visit care expenses.

#### iv. *Support Services: Parents; Rehabilitation Engineer and Equipment*

These items are denied for the reasons stated in parts III, B, 2, a, vi and viii, *supra*.

#### v. *Full Time Case Manager, 2042–2064*

Commencing in the year 2042, after Mrs. Reilly's actuarially-estimated death, the plaintiffs contend that Heather will need a full-time case manager over and above the management services provided by her residential facility. Plaintiffs' exhibit 38 at 11; plaintiffs' exhibit 63 at 2. In the absence of any evidence that her residential care facility will not adequately provide this service, I cannot be persuaded that the plaintiffs are entitled to this item. It is denied.

#### vi. *Items Dismissed Without Prejudice*

The remaining future care items involve special services and supplies that may or may not be provided by a residential care institution. No evidence has been introduced affirmatively proving that they will not be so provided. However, insofar as these remaining items appear less obviously intrinsic to residential care than wheelchairs and case management services, and in light of the defendant's failure to show that these items are not provided by such institutions, I am not prepared to deny Heather's entitlement to them at this time. Rather than enter final judgment as to these items, I will order them dismissed without prejudice. I will grant the plaintiffs leave until November 2, 1987 to refile their claims regarding these items. If they choose to do so, I would request that the plaintiffs supply the requisite evidence as to whether these items would be supplied as part of an institution's regular program of care. A detailed list of the items should be made available to a representative residential care facility or group of facilities, which can verify whether the items are routinely provided or must be separately purchased. The items covered by the Court's dismissal without prejudice include the following:

| | |
|---|---|
| Medications, Lab Tests & Special Products | $ 24,711 |
| Medical Support Services | 118,145 |
| Support Services: Heather | 1,888,855 |
| Special Education Teacher | 354,849 |
| Legal Guardian | 4,194 |

A detailed explanation and breakdown of each of these items should be furnished to the care facility or facilities in order that accurate information may be obtained.

#### c. Case Manager, 1986—2042

The plaintiffs seek $1,095,695 to purchase case manager services through 2042, the estimated year of Mrs. Reilly's death. For reasons stated in part III, B, 2, b, v, *supra*, I see no need for this item after Heather's placement in a residential care facility in the year 2026. The question remaining is whether the Reillys are entitled to case manager services while Heather lives at home.

Two witnesses explained why they recommended that a case manager be provided. Dr. Shaywitz testified that a case manager is needed "just to co-ordinate all of these services" that Heather would be receiving. Tr. of 11–20–86 at 94 (Shaywitz). Dr. Bussey testified that a case manager would be needed to relieve Mrs. Reilly of the responsibility of coordinating and covering gaps in nursing care:

> If she had two shifts of Licensed Practical Nurses, she would have to be there at the beginning of everyone's shift or at the end of the other shift, in order to update the person on what's been going on and what care needs to be done ... If the Licensed Practical Nurse does not show up and she is there then she either has to backstop the Licensed Practical Nurse, minimally she must be in touch with the providing agency and arrange for somebody else to come in.

Tr. of 11–25–86 at 128 (Bussey).

I am not persuaded by this testimony that the plaintiffs need over $1,000,000 in additional professional services to be able to manage Heather's care at home. To begin with, an award for three shifts of nurses hardly puts physical strain on Mrs. Reilly. As the evidence reflects, agencies will be providing the nurses and insuring the presence of one at each shift; common sense tells us records are kept and that a nurse does not abandon her charge until relieved by another nurse. It is absurd to believe one nurse would not advise her relief of what had transpired during her shift.

As to the management and coordination of Heather's other therapeutic and medical services, the evidence has failed to show that these involve anything more than employing individuals with the requisite skills and scheduling their treatment sessions. Without denying that these tasks may be more demanding than the management of the care of an average, healthy child, I have seen no evidence brought forth on this point. To the extent that the case manager services appear to substitute for the expected demands of parenting, I cannot, without more evidence to the contrary, make an award for this item. The case manager expenses are therefore denied.

#### C. Summary of Damages Findings

Before considering the defendant's remaining legal arguments, which are addressed in part IV, *infra*, I can offer the following tentative damages findings. First, I will summarize the future care items that have been successfully proved by the plaintiffs:

**Home Care: 1986—2025**

| | | |
|---|---|---|
| Architectural Modifications | $ 68,433 | |
| Special Room Equipment | 16,716 | |
| Treatment Equipment | 21,416 | |
| Medications, Lab Tests & Special Products | 105,837 | |
| Modified Van | 115,659 | |
| Van Operating Costs | 68,501 | |
| Medical Support Services | 144,216 | |
| Nursing Care | 5,753,853 | |
| Electric Wheelchair | 27,933 | |
| Wheelchair Maintenance | 15,093 | |
| Support Services: Heather | 1,054,286 | |
| Special Education Teacher | 361,364 | |
| Home Care Sub-total | | 7,753,307 |

Residential Care: 2026—2064

| | |
|---|---|
| Residential Care: | 1,180,016 |
| Residential Care Sub-total | 1,180,016 |
| Total Future Care Expenses | $8,933,323 |

Next, I will add up the categorical sub-totals:

**Non-economic Losses**

| | |
|---|---|
| Heather's Past and Future Pain and Suffering | 1,000,000 |
| Non-economic Losses Sub-total | $1,000,000 |

**Economic Losses**

| | |
|---|---|
| Loss of Earning Capacity (Heather) | 1,104,641 |
| Future Care | 8,933,323 |
| Economic Losses Sub-total | 10,037,964 |
| Grand Total | $11,037,964 |

Pending certification to the Rhode Island Supreme Court as to whether bystander emotional distress claims are compensable absent some physical symptomatology, I have reserved ruling on the following non-economic losses claimed:

*Emotional Distress*

| | |
|---|---|
| Mr. Reilly | $1,000,000 |
| Mrs. Reilly | $1,000,000 |

*Spousal Loss of Consortium*

| | |
|---|---|
| Mr. Reilly | $1,000,000 |
| Mrs. Reilly | $1,000,000 |

*Parental Loss of Child's Consortium*

| | |
|---|---|
| Mr. Reilly | $1,000,000 |
| Mrs. Reilly | $1,000,000 |

Also, I am dismissing without prejudice the plaintiffs' claim with respect to the following institutional care items, for which leave is granted until November 2, 1987 to refile a claim and provide the requisite supporting evidence:

| | |
|---|---|
| *Medications, Lab Tests & Special Products* | $ 24,711 |
| *Medical Support Services* | 118,145 |
| *Support Services: Heather* | 1,888,855 |
| *Special Education Teacher* | 354,849 |
| *Legal Guardian* | 4,194 |

All other damages claims are denied, for reasons discussed through part III, *supra.*

In the section that follows, I turn to the defendant's remaining legal arguments challenging the plaintiffs' entitlement to the damages that they have successfully proved.

## IV. LEGAL ARGUMENTS AGAINST THE PLAINTIFFS' ENTITLEMENT TO THE DAMAGES PROVED

The government has raised four arguments of law challenging the plaintiff's entitlement to the lump sum of damages successfully proved. First, the government contends that the method of presentation and amount requested in the. Reillys' administrative claim now limit their potential recovery. Second, it argues that certain benefit payments received by the Reillys must be deducted from the total award. Third, the government contends that Peter Reilly's recovery is barred by the teachings of *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Finally, the government argues that the Court can and should order that the judgment be paid out through the mechanism of a structured award rather than by a lump sum payment. I will discuss each of these arguments separately.

### A. The Administrative Claim as a Prerequisite to and Limitation Upon Judicial Recovery

The defendant has raised two arguments based upon 28 U.S.C. § 2675, which establishes certain administrative prerequisites for judicial recovery under the Federal Tort Claims Act. First, the defendant argues that the administrative prerequisites for Mr. and Mrs. Reilly's derivative claims were not satisfied. Second, the defendant argues that the plaintiffs' aggregate recovery may not exceed the $10,000,000 amount requested in their administrative claim. I will discuss each argument separately.

### 1. *Satisfaction of Administrative Prerequisites*

The defendant argues that certain derivative claims pleaded by Mr. and Mrs. Reilly in their amended complaint are not properly before the Court. The precise contours of the argument are difficult to discern, both because the defendant fails to cite the only applicable subsection of the relevant statute, 28 U.S.C. subsection 2675(a), and because its discussion of the

administrative prerequisites for commencing an FTCA lawsuit is repeatedly interrupted with criticism of the plaintiffs' amendment of their judicial complaint during the pendency of the lawsuit. *See* defendant's post-trial memorandum at 28–33. As to the latter criticism, the defendant sweepingly asserts that "Rule 15 of the Federal Rules of Civil Procedures do[es] not apply in the context of amendment of an F.T.C.A. case." *Id.* at 31. I agree that Rule 15's liberal standards for amending pleadings do not negate the independent statutory requirement that all claims against the United States be first "presented ... to the appropriate Federal agency," 28 U.S.C. subsection 2675(a). But if an amended pleading presents new claims that independently satisfy the requirements of subsection 2675(a), then I see no reason why leave to present such claims should not "be freely given when justice so requires," Fed.R.Civ.P. 15(a). To rule otherwise would be tantamount to holding that Congress has *sub silentio* prohibited federal tort claimants from ever amending their district court pleadings. I decline to endorse such a baseless imputation of congressional intent.

The remaining question is whether the claims presented in the plaintiffs' amended complaint satisfied the administrative claim requirements of 28 U.S.C. subsection 2675(a). That statute provides as follows:

> An action shall not be instituted upon a claim against the United States for money damages for ... personal injury or death caused by the negligent act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing.... The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant at any time thereafter, be deemed a final denial of the claim for purposes of this section....

The government does not contest that more than six months elapsed between the United States Navy's receipt of the Reillys' claims and, the Navy having failed either to grant or deny the claims, the Reillys' filing of the instant lawsuit. The government does argue, however, that certain of Mr. and Mrs. Reilly's derivative claims were either inappropriately presented to the Navy or not presented at all.

As I read the defendant's argument, the challenged claims include Mr. and Mrs. Reilly's loss of spousal consortium claims, *see* defendant's post-trial memorandum at 29, 33, and Mr. and Mrs. Reilly's emotional distress claims, *see id.* at 29–30. After examining a copy of the administrative claim form ("Form 95") that the Reillys completed and submitted to the Navy, I find that the challenged claims were included therein. The Form 95 is a very compact document; it asks the claimant to "state [the] nature and extent of injury which forms the basis of this claim," providing a box of approximately one inch by eight inches for this purpose. Into this box the Reillys typed the following:

> Hypoxic ischemic encephalopathy resulting in seizures, blindness, profound neurological deficit; loss of consortium, emotional distress. Peter Reilly and Donna Reilly sue individually on their own behalf as well as on behalf of their minor child.

In addition, under "type of employment," the following was typed in alongside a checked-off box labelled "military": "Peter Reilly; other Plaintiffs are dependents." These entires leave no doubt that the Reillys administratively filed as joint claimants with one Form 95. Although they did not separately identify the injuries claimed by each individual family member, I see no logical reason for denying that the phrase "loss of consortium, emotional distress" was meant to describe the parents' claims along with the daughter's, particularly in view of the limited space provided for such description.

The defendant further asserts that "[a] parent or spouse claiming loss of consortium must file a separate claim," citing a series of cases for support. Defendant's post-trial memorandum at 33. After re-

viewing the cited cases and the applicable regulations, I conclude that joint claimants are not required to submit separate Form 95s to validate their administrative claims.

The case that most closely supports the defendant's assertion involved a Form 95 that was signed only by the joint claimants' counsel and submitted without the requisite "evidence of [counsel's] authority to act on behalf of the claimant[s]." *Hunter v. United States*, 417 F.Supp. 272, 274 (N.D.Cal.1976). Because of this defect, the "District Counsel to the Veterans Administration ... informed counsel that each claimant would be required to complete a Form 95 in order to perfect the claim." *Id.* at 275. Following this request, the decedent's mother completed a Form 95, but the decedent's father did not. Consequently, after the parents filed suit in federal district court, the father's claim was dismissed for "failure to file an administrative claim as required by 28 U.S.C. section 2675(a)." *Id.*

*Hunter* does not hold that a single Form 95 cannot accommodate joint claims. In that case, the initial Form 95 was defective not because it incorporated joint claims, but because neither the signatures of the claimants nor evidence of their attorney's authority was submitted with it. Furthermore, the subsequent Veterans Administration request for separate forms finds no support in either the relevant regulations or their judicial construction. The relevant regulations make no mention of a separate form requirement for joint claimants. *See* 28 C.F.R. §§ 14.2–14.4 (administrative claim requirements under the FTCA); 32 C.F.R. §§ 750.33—750.34 (Navy regulations governing FTCA administrative claims). And in the other cases cited by the defendant, the derivative claims dismissed by the courts had never been mentioned in any of the Form 95s submitted to the government; the issue of joint claimants listing their claims on a single form was never reached. *See Johnson v. United States*, 496 F.Supp. 597, 602 (D.Mont.1980); *Knouff v. United States*, 74 F.R.D. 555 (W.D.Pa.1977); *Green v. United States*, 385 F.Supp. 641, 642–44 (S.D.Cal.1974); *Collazo v. United States*, 372 F.Supp. 61, 61–63 (D.P.R.1973).

As the court noted in *Johnson, supra,* "[t]o preserve her right to bring a derivative but separate FTCA action in this court for loss of consortium, plaintiff's wife ... was required *either to join in plaintiff's claim or to file a separate claim.*" 496 F.Supp. at 601 (citation omitted) (emphasis added). And as the defendant itself concedes, in apparent contradiction to its "separate claim" argument, "[e]very claimant is required to file, *either separately or jointly with other claimants,* an administrative claim." Defendant's post-trial memorandum at 32 (emphasis added).

In light of the foregoing, I find that all of the plaintiffs' claims were administratively presented in accordance with 28 U.S.C. subsection 2675(a), and that those claims are now properly before the Court.

### 2. *Limitation of the Total Recovery*

■ The defendant argues that the plaintiffs' combined total recovery may not exceed the $10,000,000 requested in their administrative claim. They cite 28 U.S.C. subsection 2675(b), which provides as follows:

Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

The issue here is whether the increased *ad damnum* in the judicial action is attributable to either "newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or ... intervening facts, relating to the amount of the claim."

Before answering this question, however, a preliminary aspect of the defendant's argument on this point must be addressed. Here, as in the preceding section, the defendant appears to confuse the administrative prerequisites to raising an FTCA claim in federal court with the feder-

al procedural rule governing the amendment of district court pleadings. *See* defendant's post-trial memorandum at 36. Since I have already considered and rejected the defendant's argument regarding Rule 15, I will simply reiterate my conclusion from the preceding section: the amendment of pleadings in an FTCA action is governed by Fed.R.Civ.P. 15; but the amended pleadings must independently satisfy the administrative prerequisites of 28 U.S.C. § 2675. Because I see no Rule 15 violation in having granted the plaintiffs leave to file their amended complaint, the only question for the court is whether the amended complaint's *ad damnum* is allowable under the "newly discovered evidence" or "intervening facts" clauses of 28 U.S.C. subsection 2675(b).

In this case I believe that the exceptional circumstances required by these clauses are present. The Reillys filed their administrative claim on May 7, 1985, when Heather was just under six months old. All the medical experts testified that the extent of Heather's injuries could not be known by May of 1985. The diagnostic obstacles existing at that time were well described by Dr. Shaywitz:

What you can tell, and what you know almost certainly by five months was that Heather was going to have a damaged nervous system. *What you couldn't tell, and in fact nobody can tell, is the degree of that disability....* We don't know, one, whether the child can see. Of course *it really wasn't established whether the child could see at that point.* We don't know how much progress she's going to make over the next few months. *We don't know what degree of disability she's going to have motorically.* All of these things are big unknowns.... [T]here is no one test that you can do that predicts the degree of disability. *The only thing you have to go on is the child's clinical course, exactly what does the child do as the child develops, and so at five, six months of age, I don't think you really know.* All you know is the child is going to have a significant disability. You don't know the degree of that disability.

Tr. of 11–20–86 at 96–97 (Shaywitz) (emphasis added); *see also* tr. of 11–21–86 at 147–50 (Vohr). Only after May, 1985 did it become medically apparent that Heather would never be able to walk or talk, and that she would be able to see only enough to distinguish light from dark. Tr. of 11–20–86 at 21, 24 (Shaywitz). None of these facts were disputed by the defendant. Given the undisputed medical impossibility of knowing the extent of Heather's multiple disabilities at the time the administrative claim was filed, I find the experts' subsequent confirmation that the worst possibilities had materialized to constitute "newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency ...," 28 U.S.C. subsection 2675(b).

The defendant contends that where the type of injury suffered is known, the impossibility of knowing its extent at the time of the administrative filing "is beside the point." Defendant's post-trial memorandum at 34. I strongly disagree. As another court reviewing an analogous set of facts has commented, "[a] rule that would require the plaintiff to know the full extent of his injuries when they are such that medical science cannot immediately establish them is neither logical nor practical." *Joyce v. United States*, 329 F.Supp. 1242, 1247–48 (W.D.Pa.1971), *vacated on other grounds*, 474 F.2d 215 (3d Cir.1973); *see also Powers v. United States*, 589 F.Supp. 1084, 1110 (D.Conn.1984) ("[W]hen a plaintiff does not know fully the 'medical extent of his injuries and expenses' at the time of his administrative complaint, the exceptions to § 2675(b) are triggered." (citations omitted)); *Foskey v. United States*, 490 F.Supp. 1047, 1061 (D.R.I.1979).

The above facts are sufficient to permit the Reillys to recover damages that exceed the $10,000,000 requested in their administrative claim. A further fact that could prove similarly significant is Mr. Reilly's July, 1986 suicide attempt. *See* tr. of 11–24–86 at 91 (Peter Reilly). I have refrained from deciding whether a suicide attempt constitutes a physical symptom sufficient to bring Mr. Reilly's emotional distress

claim within the established doctrine of *D'Ambra v. United States*, 114 R.I. 643, 338 A.2d 524 (1975). The issue might not need to be reached, depending on how the Rhode Island Supreme Court answers the physical symptomatology question on certification. But if physical symptomatology turns out not to be a requirement of emotional distress recovery or, alternatively, if Mr. Reilly's suicide attempt constitutes a physical symptom of emotional distress, then the attempted suicide would constitute an "intervening fact[ ], relating to the amount of the claim," further permitting recovery in excess of the administrative claim's *ad damnum* under 28 U.S.C. subsection 2675(b).

## B. The Collateral Source Rule

The Collateral Source Rule permits an injured party to recover medical expenses from a defendant although those expenses have been reimbursed by a third party, provided that the reimbursement was provided by a source collateral to the defendant. *See Siverson v. United States*, 710 F.2d 557, 559 (9th Cir.1983). The government contends that Rhode Island has abolished the Collateral Source Rule, thus any contributions for Heather's care to be made by the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) and the Education of All Handicapped Children Act of 1975 may be deducted from the future care expenses awarded for Heather's support. In support of its position, the government cites R.I.Gen.Laws § 9–19–34 which provides:

> Collateral source rule in medical malpractice actions. —(a) in the event the defendant so elects, *in an action for personal injury against a licensed physician, hospital, clinic, health maintenance organization or professional service corporation providing health care services* under chapter 5.1 of title 7 of the general laws based upon professional negligence, *he may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury* pursuant to the United States social security act, any state or federal income disability or workers' compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services. *Where the defendant elects to introduce such evidence*, the plaintiff may introduce evidence of any amount which the plaintiff has paid or contributed to secure his right to any insurance benefits concerning which the defendant has introduced evidence. When such evidence is introduced, the jury shall be instructed to reduce the award for damages by a sum equal to the difference between the total benefits received and the total amount paid to secure such benefits by the plaintiff or the court may ascertain such sum by special interrogatory and reduce the award for damages after verdict.

(emphasis added).

A plain reading of this statute indicates that the United States is not an enumerated defendant to whom this statute applies. Furthermore, this statute extends its protection to a specific class of defendants of which the United States is not a member: health care providers who purchase malpractice insurance. Moreover, the statute provides that the defendant may introduce evidence of benefits payable to the plaintiff; thus the statute places the burden on the defendant to establish a right to a setoff by presenting evidence of the payments delineated in the statute. The defendant has utterly failed in carrying this burden.

During cross examination, defense counsel questioned Mr. Reilly as to his eligibility for CHAMPUS payments:

Q. It's my understanding you're going to be in the Navy until 1988?

A. Yes, that's correct.

Q. And is it not a fact that upon, let's say retirement, if you will, that you can receive certain CHAMPUS payments after that for medical bills?

A. If I ...

Q. As a veteran?

A. If I were to stay in for twenty years, yes.

Q. But even if you retire, in other words, in 1988, you will not get them?

A. I will receive absolutely nothing.

Q. But up to that time you will, in fact, receive them?

A. Yes, until the day I get out.

Q. And that includes not only for Heather but, of course, for yourself as well as Mrs. Reilly?

A. For my family until August 28, 1988.

Tr. of 11–24–86 at 102–103 (Peter Reilly). The government's questioning proceeded no further, and the limited questioning pursued during cross examination of Mr. Reilly falls far short of satisfying the statute. The government was given a second opportunity to question Mr. Reilly on May 5, 1987, with the following result:

Q. Mr. Reilly, I just want to clear a couple of things up. You are—so far your medical bills have been paid by CHAMPUS, I'm talking medical bills for Heather?

A. By CHAMPUS and Medicaid.

Q. And Medicaid?

A. Yes.

Q. And you are going to be in the Navy until 1988, August 1988, is that correct, sir?

A. My current enlistment is up August of 1987 and I applied for and was granted a one-year extension which I have not signed yet.

Q. And your medical bills for Heather will be paid under CHAMPUS until August 1988, if you remain in the service?

A. Primarily by Medicaid but, yes, also by CHAMPUS, too.

Q. Part of the bills they're paying also the bills that were incurred at the Maher Center? Do they pay those bills?

A. The State is—early intervention program is funded by the State. There are—we receive no bills and CHAMPUS pays no bills for her going to school.

Q. They have not charged you for it, that's what I'm saying?

A. No, it's funded by the State.

Q. And—sorry. These are exhibits thirty-nine—on Exhibit Thirty-nine, I have noticed the following statement that you made to, I believe it was a psychiatrist, and you stated things would get better when Heather, she turns three years as day care would increase and we could get more free time. Do you remember making that statement to the psychologist or psychiatrist?

A. If she were to attend school full time—

Q. Were you talking the school under the Aid to Handicapped Children Act?

A. My understanding is that when Heather turns three she will go to school full time.

Q. Do you know if that's under the Aid to Handicapped Children Act? You—you remember when you were here—when we were here on April 16 and Mr. Avila testified?

A. Yes.

Q. And they were testifying about the Act for the Aid to Handicapped Children?

A. Uh-huh.

Q. Would she be going to school under that Act?

THE COURT: If you know, Do you know?

Q. If you know?

A. I'm not positive.

Tr. of 5–5–87 at 79–80 (Peter Reilly). As this exchange indicates, the government failed to develop any meaningful evidence as to the extent of the Reillys' eligibility for CHAMPUS payments or for aid under the Education of All Handicapped Children Act.

The government contends that it was precluded from pursuing this line of inquiry; however, an examination of the trial record indicates that the government was afforded several opportunities to elicit proof on this issue, both at trial and at a separate hearing held on May 5, 1987. To the extent that the defendant was not permitted to pursue its inquiry into payments

made by third parties, those questions pertained to payments already received by the plaintiffs. Since the plaintiffs seek no recovery for past medical expenses, the defendant's questions were properly excluded on relevancy grounds. Tr. of 11–19–86 at 116–17; Tr. of 11–24–86 at 102; Tr. of 11–25–86 at 161. Accordingly, I rule that the government is not entitled to offset payments made for Heather's future care with benefits paid under CHAMPUS or the Education of All Handicapped Children Act.

C. The *Feres* Doctrine

 The *Feres* doctrine bars recovery under the FTCA for injuries to members of the armed forces if the injuries are incurred "in the course of activity incident to service." *Feres v. United States*, 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950). The defendant contends that this doctrine precludes Mr. Reilly from recovering for his claimed injury, since he was on active duty at the time Heather was born and is claiming damages for an injury suffered by reason of the negligence of military medical personnel. It is alleged that this injury, namely, the depression which followed the birth of Heather as a severely brain damaged child, was suffered directly by him; the fact that "Reilly's alleged injuries may be derivative from Heather's injuries ... does not take them out of the ambit of *Feres*." Defendant's post-trial reply memorandum at 11. Specifically, the defense argues that Mr. Reilly "suffered his injuries because of the actions of other service personnel who attended to his wife and daughter. They would not have been treated there but for his active military status. Since military personnel were in charge of his wife and daughter, any injuries he suffered, were caused by those same military personnel. Thus the averments as to his injuries, could have implications on the management of the military, re, supervision and discipline of Mr. Reilly." *Id.* at 12 (citation omitted). The government cites the cases of *Scales v. United States*, 685 F.2d 970 (5th Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1772, 76 L.Ed.2d 344 (1983) and *Utley v. United States*, 624 F.Supp. 641 (S.D.Ind.1985) as primary support for this position.

The facts in both cited cases may be distinguished from those under consideration in this case. In *Scales*, a servicewoman on active duty was negligently treated by medical military personnel; as a result, her child was born with congenital birth defects. *Scales*, 685 F.2d at 971–72. The court held that the infant's FTCA suit was barred by *Feres*, reasoning that the allegation of negligence focused entirely on the medical treatment given to the mother and that this treatment was "inherently inseparable from the treatment accorded [the infant] as a fetus in his mother's body." *Id.* at 974. The court found that the injury to the mother, who was in the military service, was caused by fellow members of the armed forces, and that to maintain such a suit, the court would have had to examine the conduct of military personnel in the performance of their military service—the very thing prohibited by *Feres*. *Id.* This is far different from the case at bar.

*Utley* may be analogized to the case at hand. The mother, a servicewoman, received negligent pre-natal treatment from military doctors; as a consequence, the plaintiff infant was born with physical disabilities. *Utley*, 624 F.Supp. at 642. The court ruled that the fact that both parents "were in the service at the time of the alleged malpractice bars them from recovery because of the policy reasons outlined in Feres": the "distinctly federal" relationship between the government and members of the armed forces, the existence of a no-fault statutory compensation plan for military personnel, and the need to protect military discipline. *Id.* at 643. The *Utley* court dismissed the parents' case because "to allow a suit where *servicemen* might question decisions made by military officers" would threaten military discipline. *Id.* at 643–44 (emphasis in original). This, of course, is the overall concern and the very core of *Feres:*

[T]he protection of military discipline ... serves largely if not exclusively as the predicate for the *Feres* doctrine. Although the [Supreme] Court has woven a

tangled web in its discussion of the "distinctly federal" notion and of the alternative compensation system, it has not wavered on the importance of maintaining discipline within the armed forces. The Court has found it unseemly to have military personnel, injured incident to their service, asserting claims that question the propriety of decisions or conduct by fellow members of the military. Only this factor can truly explain the *Feres* doctrine and the crucial line it draws....

*Monaco v. United States*, 661 F.2d 129, 132 (9th Cir.1981) (quoting *Hunt v. United States*, 636 F.2d 580, 599 (D.C.Cir.1980)), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).

With all due respect, although the father in *Utley* and Mr. Reilly occupy the same position, I do not agree with the *Utley* court that there is a military interest in such cases. An exegesis of this question is set forth in *Atkinson v. United States*, 804 F.2d 561 (9th Cir.1986), with which I thoroughly agree and whose reasoning I adopt.

In *Atkinson*, the plaintiff sued the government for negligent pre-natal medical treatment she received at a military hospital while on active duty status. As a result of such treatment, she delivered a stillborn child and personally suffered physical and emotional injuries.

The court in *Atkinson* thoroughly analyzed the *Feres* doctrine noting the need to eschew a *per se* application. "The *Feres* doctrine cannot be reduced to a few bright-line rules; each case must be examined in light of the statute as it has been construed in *Feres* and subsequent cases." *Id.* at 563 (quoting *Shearer v. United States*, 473 U.S. 52, 57, 105 S.Ct. 3039, 3043, 87 L.Ed.2d 38 (1985)). The court detailed the doctrine's inapplicability to Atkinson's claim:

> Making this inquiry, we find that the *Feres* doctrine does not bar Atkinson's claim. We first note that pregnant servicewomen did not serve on active duty in 1950 when *Feres* was decided. Thus, the Supreme Court, in barring the two malpractice claims involved in *Feres*, could not have had in mind the unique facts involved in Atkinson's claim. Con-

fronting this novel situation, we fail to see how Atkinson's suit for negligent care administered in a non-field military hospital incident to her pregnancy can possibly undermine "the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel...." *Chappell v. Wallace*, 462 U.S. 296, 304, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983). At the time Atkinson sought treatment, she was "not subject in any real way to the compulsion of military orders or performing any sort of military mission." *Johnson v. United States*, 704 F.2d at 1431, 1439 (9th Cir.1983). No command relationship exists between Atkinson and her attending physician. No military considerations govern the treatment in a non-field hospital of a woman who seeks to have a healthy baby. No military discipline applies to the care a conscientious physician will provide in this situation. Thus, in seeking treatment for complications of her pregnancy, Atkinson "was subject to military discipline only in the very remotest sense." *Id.* at 1440. *Cf. United States v. Lee*, 400 F.2d 558, 564 (9th Cir.1968) ("The necessity of maintaining discipline while a soldier is ... on an operating table is far less clear than the necessity for maintaining discipline among soldiers being transported for military service in military aircraft under control of military authorities."), *cert. denied*, 393 U.S. 1053, 89 S.Ct. 691, 21 L.Ed.2d 695 (1969).

Moreover, the circumstances of this case simply "do not involve the sort of close military judgment calls that the *Feres* doctrine was designed to insulate from judicial review." *Johnson*, 704 F.2d at 1440. We are not dealing with a case "where the government's negligence occurred because of a decision requiring military expertise of judgment." *Id.* Thus, a court hearing Atkinson's claim will not have to inquire into "complex, subtle, and professional decisions as to composition, training, equipping and control of a military force." *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973). The

care provided a pregnant woman hardly can be considered to be distinctively military in character. In short, Atkinson's injuries have nothing to do with her army career "except in the sense that all human events depend upon what has already transpired." *Brooks v. United States,* 337 U.S. 49, 52, 69 S.Ct. 918, 920 [93 L.Ed. 1200 (1949)]. There is simply no connection between Atkinson's medical treatment and the decisional or disciplinary interest protected by the *Feres* doctrine.

*Id.* at 564–65. The foregoing is a "hand an glove" fit with the case at issue. Following *Atkinson,* I find that the *Feres* doctrine does not bar Mr. Reilly's claim.

My conclusion that the *Feres* doctrine does not bar Mr. Reilly's claim is not contradicted by the Supreme Court's most recent enunciation of the doctrine in *United States v. Johnson,* — U.S. —, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987). In *Johnson,* the Court reversed the Eleventh Circuit Court of Appeals in holding that the *Feres* doctrine barred a suit brought under the FTCA by the wife of a United States Coast Guard helicopter pilot who was killed during a rescue mission through the negligence of a Federal Aviation Administration air controller. The Court declined to modify the doctrine which "has been applied consistently to bar all suits on behalf of service members against the government based upon service-related injuries." *Id.* at 2067. The Court reiterated the three basic rationales underlying *Feres* and its progeny, namely, the "distinctly federal" character of the relationship between the government and members of the armed services, the availability of comprehensive disability and death benefits and the need to avoid the detrimental effects of judicial interference on sensitive matters of military discipline. *Id.* at 2068.

To the extent that *Johnson* merely repeats without reformulating the basic tenets of the *Feres* doctrine, the decision does not alter my analysis of the doctrine's inapplicability to the present case. Mr. Reilly's claim derives from the negligent treatment of Heather, and by no stretch of logic can be considered service-related.

### D. Structuring the Future Care Award

■ The defendant argues that the Court can and should order that a structured award be set up to pay for Heather's future care expenses. A structured award, involving the purchase of an annuity and a schedule of periodic payments, would be "substantially less [costly] than a lump sum award...." Defendant's post-trial memorandum at 83. Since "anything in excess of the amount necessary to compensate the claimant is punitive ... the awarding of damages in a lump sum is tantamount to assessing punitive damages." *Id.*

I agree that if the Court possessed the discretion to order structured awards, the exercise of such discretion would be practically mandated by the unique facts of this case. Heather's total and permanent inability to participate in the management of her care, the lifelong duration of her need for a plethora of support services and the extraordinarily large sums of money at stake combine to make this a textbook example of the type of case that calls for a structured settlement. But in the absence of agreement by the parties to structure the future care award, the law leaves the Court with no alternative but to order the payment of a lump sum judgment. *See Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 533, 103 S.Ct. 2541, 2548–49, 76 L.Ed.2d 768 (1983) ("The award could in theory take the form of periodic payments, but in this country it has traditionally taken the form of a lump sum, paid at the conclusion of the litigation."); *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027, 1030 (1980) ("Personal injury awards are usually lump-sum payments, and are not paid in weekly or monthly installments."); MODEL PERIODIC PAYMENT OF JUDGMENTS ACT ("MPPJA"), Prefatory Note, 14 U.L.A. (1987 Supp.) at 22 ("The common law system of awarding damages in bodily injury cases is that of lump sum payment."); B. Kolbach, *Variable Periodic Payments of Damages: An Alternative to Lump Sum Awards,* 64 IOWA L.REV. 138, 138 (1978) ("The common-law rule providing for a single lump sum payment for

all past, present, and prospective losses stemming from an injury has remained essentially unchanged since its inception." (citations omitted)).

The Third Circuit Court of Appeals directly addressed this issue within the context of the FTCA, concluding that the federal waiver of sovereign immunity incorporates traditional common law principles of liability, including the rule that damages must be awarded in lump sum judgments. *Frankel v. Heym,* 466 F.2d 1226, 1228–29 (3d Cir.1972). The precise question on appeal was whether the district court had erred in rejecting a government request that the damages award take the form of a reversionary trust for the plaintiff's benefit; the government would supplement the trust corpus when necessary during the plaintiff's life and would take any amount remaining in the trust at the plaintiff's death. *Id.* at 1228. The appeals court affirmed the decision below, reasoning as follows:

> [C]ourts of law had no power at common law to enter judgment in terms other than a simple award of money damages. In view of that limitation, we have examined the enactment, 28 U.S.C. ch. 171, that authorized and circumscribed tort actions against the sovereign and, to some extent, prescribed the procedure for such cases.... [S]ection 1346(b) authorizes district courts to entertain "civil actions on claims against the United States, for money damages...." Arguably, this language at least implies that primary awards in such civil suits must take the form of common laws money judgments, the only form of "money damages" known to the common law. More probably, the Congress never considered whether it might be desirable

that some awards be made in a different form.

> We agree with the district court that *in administering the legislation in question a district court should not make other than lump-sum money judgments unless and until Congress shall authorize a different type of award.* The relaxation of sovereign immunity is peculiarly a matter of legislative concern, responsibility and policy. *If novel types of awards are to be permitted against the government, Congress should affirmatively authorize them.*

*Id.* at 1228–29 (emphasis added); *see also Diede v. Burlington Northern R.R. Co.,* 772 F.2d 593, 596 (9th Cir.1985); *Elliot v. United States,* 329 F.Supp. 621, 628 (D.Me. 1971).[4]

By necessary implication, these cases treated lump sum future care awards as serving a compensatory and not a punitive function. And insofar as the sums awarded are eventually expended upon the anticipated future care items discussed in part III, *supra,* the award is compensatory in the strictest sense of the word. The existence of a less costly method of financing those future care costs is simply irrelevant to the fact that, whether provided by a lump sum or by a periodic annuity payment, the money serves only to compensate the plaintiffs for out-of-pocket expenses that they will incur in financing Heather's care. I therefore reject the government's argument that a lump sum future care award is punitive simply because the same level of future care could be provided at lower cost through the purchase of an annuity.

■ The more difficult question concerns the possibility that some portion of

---

**4.** It might further be argued that the Court's authority to order structured awards under the FTCA is governed by the applicable state law, since the FTCA renders the federal government liable "in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. Assuming, *without deciding, that this is so, the Court in* this state remains bound by the traditional common law rule requiring lump sum judgments. In 1986 the Rhode Island legislature passed a law applicable to all medical malpractice causes

of action "arising on or after January 1, 1987," requiring that "the parties ... consider the use of periodic payments as a means of settlement." R.I.G.L. § 9–21–12 (Supp.1986). This law, which would not even apply to the Reillys' pre-1987 cause of action, speaks only to settlement negotiations, not to final judgments. Thus, by conscious omission, the Rhode Island legislature has chosen not to vest the courts with the power to order structured awards in medical malpractice cases.

the future care award will never be expended for Heather's care. The government argues that payment "for costs which the plaintiffs will not expend ... is tantamount to punitive damages." Defendant's post-trial memorandum at 65. In order to address this argument, it is necessary to consider the different ways in which the future care award might not be put toward its designated use. Three scenarios come to mind: (1) Heather fails to live out her full life expectancy; (2) Heather's funds are expended on items other than her future care expenses; and (3) Heather is placed in a residential care facility before the year 2026 and thus before the sums awarded for home care have been exhausted.

1. *Heather Fails to Live Her Life Expectancy*

If Heather dies early, the unexpended portion of the future care award will pass to Heather's heirs. It might be argued that such sums would provide a windfall to the heirs, and as such should instead revert to the government upon Heather's death. But no authority has been brought to the Court's attention, nor do I know of any, in which such a fortuity has been held to authorize a court to order that the award be placed in a reversionary trust. The risk that a foreshortened life expectancy will result in overcompensation to a successful tort plaintiff is present in virtually every personal injury case, whether arising under the FTCA, the common law or some other state or federal statutory provision. Since all such cases involve requests for compensatory damages, the paucity of any known authority for characterizing a potential overpayment as non-compensatory counsels strongly against changing the rules in this case.

Recently, the Seventh Circuit Court of Appeals faced this precise issue within the context of an FTCA claim, concluding that the ever-present risk of under-compensation undermines the rationale for treating the fortuitous over-compensation as a windfall. *Nemmers v. United States,* 795 F.2d 628, 635 (7th Cir.1986). In *Nemmers,* the district court had reduced the injured

child's future care award, in part to prevent a fortuitous "windfall" to the child's heirs. The Circuit Court vacated the judgment, reasoning as follows:

> The district court's theory was apparently that his parents and siblings, his likely heirs, should not benefit from his misfortune. If the award of damages is computed correctly, however, there will be just enough to last for Eric's life. The court assumed that Eric would live another 59 years....
>
> Eric's parents or guardian must decide whether to purchase an annuity or to assume the risk that Eric will live longer than expected. If they buy an annuity, the insurer takes the risk ... If they take the risk that Eric will outlive the expectation, and he does, then the funds awarded by the court will be gone in 59 years and they must make up the difference. *If Eric dies early, then his relatives do not get a "windfall", as the court thought; they get only compensation for assuming the risk of having to cover Eric's expenses if he outlives the income provided by the award.*

795 F.2d at 635 (emphasis added).

This risk-assumption analysis rests on a principle of fairness, namely, that the party who bears a given risk deserves to enjoy the corresponding benefit. Since courts cannot order supplemental payments for plaintiffs whose actual care expenses exceed their future care awards, granting the government a reversion in any surplus from the future care award would violate this principle of fairness. The plaintiffs would retain the risk that Heather's future care expenses may exceed the future care award, while the defendant would enjoy the benefits resulting if the future care award fortuitously exceeded the actual expenses incurred. Only in the latter situation, where the party enjoys a benefit without shouldering the corresponding risk, can it be said that a true windfall has occurred.

I have no doubt that the best solution for all concerned in this case would be a structured award, which would place both the risks and the corresponding benefits on a third-party insurer. But as long as the tort

law by which I am bound requires that I award the plaintiffs a lump sum, which carries the inherent risks of under-compensation, I agree with the *Nemmers* court that the corresponding benefit of a possible surplus must also rest with the plaintiffs. Under these circumstances, the economic fortuity realized by Heather's heirs in the event of her premature death cannot be deemed a punitive award under the FTCA.

### 2. Heather's Future Care Funds are Improperly Administered

Without in any way doubting the integrity, sincerity and good intentions of Mr. and Mrs. Reilly, I believe the sheer size of the future care award combined with the many years over which it must be administered present a significant risk that it could be consumed ahead of schedule. *See* Kolbach, *supra,* 64 IOWA L.REV. at 144 (summarizing studies showing that large lump sum awards are frequently exhausted "before the loss itself is remedied").

Because this eventuality would have no effect upon the factual basis for the future care award, i.e., Heather's proven future care needs, it would in no way diminish the fact that the Court's award consists of compensatory, not punitive, damages.

However, the possibility of improper administration of the future care funds cannot simply be disregarded by the Court. Heather is presently an infant, and her mind will remain in an infantile state for the duration of her life. Consequently, neither now nor at any time in the future will she possess the capacity to participate in the management of her care; her well-being will depend entirely on the judgment of others.

To assure that sound judgment guides Heather's future care, I will order that the damages allocated to the future care items be placed in a trust for the duration of Heather's life. The trust and trustees will be approved by the Court at a subsequent hearing.

### 3. Heather is Placed in a Residential Care Facility Before the Year 2026

The present value of Heather's care at home for the next 39 years is $7,753,307.

Heather's future care expenses would be substantially less if the Reillys elected to place her in an institution immediately or sometime in the near future.

Having resolved that the Reillys are entitled to care for Heather at home and to receive compensation commensurate with this choice, *see* part III, B, 2, *supra,* I must consider the possibility that the Reillys might choose to shorten Heather's anticipated home care period. As with the possibility of premature death, this eventuality would leave the Reillys with more money than they would need to provide for Heather's care. The question for the Court is whether this possibility merits different treatment than the possibility of a premature death. I believe that it does.

As made clear in part IV, D, 1, *supra,* the financial consequences of Heather's premature death cannot be deemed a pure windfall, because the Reillys would have paid for any monetary surplus by having assumed the risk that Heather's actual care expenses would exceed the future care award. But if the Reillys elect to place Heather in an institutional care facility earlier than they had planned, then this offset between risk and benefit would no longer be operative as to at least some of the home care funds awarded. No longer would the Reillys be assuming a risk that Heather's home care expenses might exceed the home care funds.

It follows that if the Reillys elect to place Heather in an institutional setting before the year 2026, some portion of the home care funds would become a pure windfall to the Reillys, serving to compensate neither for Heather's actual care expenses nor for the attendant financial risks assumed by her family. By ceasing to serve any compensatory function, those funds would become the equivalent of a punitive award, which is disallowed under the FTCA. As to those funds, therefore, the government is entitled to a reversion.

Some difficulty lies in specifying ahead of time what funds ought to be subject to the government's reversion. One approach

that may help clarify the matter is to work backwards, specifying what portion of the future care funds ought *not* to revert to the government. The most obvious exempt funds are those designated for Heather's institutional care after the year 2025. Even after Heather is institutionalized, the risk remains that her institutional care costs will exceed the designated funds available. Since the Reillys can never pass on this risk without passing on all the designated funds to a third-party insurer, the government has no right to a reversion over the post–2025 institutional care funds.

In addition, if the Reillys place Heather in an institutional care setting before the year 2026, then they remain entitled to compensation for the institutional care costs incurred prior to 2026. This means that the Reillys should retain out of the designated home care funds an amount equal to the cost of institutional care between the year of Heather's institutionalization and the year 2026. The home care funds remaining after these institutional care expenses have been deducted constitute the pure windfall, which should revert to the government.

The foregoing makes clear that the reversionary amount depends on two variables, which must be estimated for the actual year of Heather's earlier-than-scheduled institutional placement. These two variables are, first, the home care funds remaining on hand that year and, second, the cost of Heather's institutional care from that year until the year 2026. Subtracting the second from the first yields the reversionary amount.

Since the reversionary amount is contingent upon the particular year in which the Reillys might elect an early institutional placement for Heather, the best that the Court can do in setting up the reversionary portion of the future care trust is to incorporate the above guidelines in the articles of trust. I believe it would be a mistake to specify a year-by-year table of the reversionary amount, because the estimates of the two underlying variables would in all likelihood become increasingly inaccurate over time. In addition, since the calcula-

tion of the reversionary amount will not be necessary unless and until Heather is prematurely placed in an institutional care setting, I see no reason to address this task now.

## V. CONCLUSION AND ORDER

I have found that the defendant, the United States of America, acting by and through its attending obstetrician, negligently administered obstetric care during the birth of Heather Reilly, which proximately caused the nearly total devastation of Heather Reilly's mind and body. I have further found that the plaintiffs are entitled to the following damages, as summarized in greater detail in part III, C, *supra:*

| | |
|---|---|
| Heather's Past and Future Pain and Suffering | $1,000,000 |
| Heather's Lost Earning Capacity | 1,104,641 |
| Heather's Future Care | 8,933,323 |
| Total | $11,037,964 |

I hereby order that the future care amount payable for the benefit of Heather be placed in a trust to last for the duration of Heather's life, with the articles of trust and trustees to be approved at a subsequent hearing. I further order that a reversion in favor of the government be placed over the portion of the future care trust that would otherwise confer a pure windfall upon Heather's heirs in the event of Heather's institutionalization before the year 2026; the guidelines for determining the reversionary amount are set out in part IV, D, 3, *supra.*

I have further found that Mr. and Mrs. Reilly's psychic injury claims rest upon an unresolved question of state law, namely, whether a bystander who otherwise satisfies the criteria of *D'Ambra v. United States,* 114 R.I. 643, 338 A.2d 524 (1975), may recover emotional distress damages without suffering any physical symptomatology. I therefore order the plaintiffs to draft the question and appropriate certification to the Rhode Island Supreme Court. Because the bystander emotional distress claims are significantly intertwined with Mr. and Mrs. Reilly's loss of consortium claims, as discussed in part III, A, 3, *supra,* I hereby defer ruling on all of Mr. and

Mrs. Reilly's non-economic loss claims pending certification to the state court.

I have further found that, with respect to certain items of Heather's future care, the trial record leaves the Court with insufficient information to issue a final judgment. These items, which are listed in part III, B, 2, b, vi, *supra*, all relate to Heather's future care after she has been placed in a residential care facility. I hereby order that the plaintiffs' claim with respect to these items be dismissed without prejudice. The plaintiffs are hereby granted leave until November 2, 1987 to refile their claim as to these items, supplying the requisite evidence for the Court to issue a final judgment.

It is so ordered.